## NATIONAL BISCUIT CO. v. FEDERAL TRADE COMMISSION.

### LOOSE-WILES BISCUIT CO. v. SAME.

(Circuit Court of Appeals, Second Circuit. May 5, 1924.)

No. 346.

1. **Trade-marks and trade-names and unfair competition ☞68—Permitting owner of chain stores to pool purchases, and refusing to permit owners of single stores to pool purchases, for computation of discount, held fair competition.**

   A sales policy of giving a graduated quantity discount to owner of chain stores on total purchases of all the stores of the chain, and refusing to allow owners of a single store to pool their purchases for purpose of computing discount, *held* fair competition and not violative of Federal Trade Commission Act, § 5 (Comp. St. § 8836e) and Clayton Act, § 2 (Comp. St. § 8835b).

2. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Commission's finding of facts supported by testimony conclusive.**

   A finding of Federal Trade Commission as to the facts, if supported by testimony, is conclusive on a review in the Circuit Court of Appeals.

3. **Monopolies ☞12(1)—Size does not create monopoly.**

   Size alone does not create a monopoly.

4. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Meaning of phrase "unfair methods of competition" held for courts.**

   The meaning of the phrase "unfair methods of competition," within Federal Trade Commission Act, § 5 (Comp. St. § 8836e), is for the courts and not the Commission to determine as a matter of law, and this rule is not voided by stating as a finding of fact what is a conclusion of law.

5. **Monopolies ☞8—Exclusion of others from opportunity of doing business held monopolizing.**

   It is the exclusion of others from the opportunity of doing business that is regarded as monopolizing.

6. **Trade-marks and trade-names and unfair competition ☞68—Unfair competition characterized by fraud, deception, or oppression.**

   To be successful may increase or render insuperable the difficulties that rivals must face, but it does not constitute fraudulent or unfair methods, as methods of competition, to be condemned as unfair, should be characterized by fraud, deception, or oppression.

Petitions to Revise Orders of the Federal Trade Commission.

Separate petitions by the National Biscuit Company and by the Loose-Wiles Biscuit Company against the Federal Trade Commission to revise Commission's orders. Orders reversed.

William C. Breed and Charles A. Vilas, both of New York City, George E. Shaw, of Pittsburgh, Pa., and Dana T. Ackerly, of New York City, for National Biscuit Co.

Patterson, Eagle, Greenough & Day, of New York City (J. Frederick Eagle and Carroll G. Walter, both of New York City, of counsel), for Loose-Wiles Biscuit Co.

W. H. Fuller, of McAlester, Okl., and I. E. Lambert, of Washington, D. C., for Federal Trade Commission.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

MANTON, Circuit Judge. [1] These proceedings to review orders of the respondent were heard together, and will be disposed of in one opinion. The complaints against the petitioners charge (a) violation of section 5 of the Federal Trade Commission Act (38 Stat. 717 [Comp. St. § 8836e]); (b) violation of section 2 of the Clayton Act (38 Stat. 730 [Comp. St. § 8835b]). The petitioners manufacture and sell to retail grocers crackers, biscuits, cakes, and other bakery products. They are perishable, and therefore sold in small quantities at frequent intervals to insure freshness and quality. The petitioners have a business policy of allowing the following discounts: (a) Customers whose purchases from the company in a calendar month are less than $15 pay list prices with no discounts; (b) customers whose purchases from the company in a calendar month aggregate $15 or more receive a quantity discount of 5 per cent.; (c) customers whose purchases from the company in a calendar month aggregate $50 or more receive a quantity discount of 10 per cent.; (d) customers whose purchases from the company in a calendar month aggregate $200 or more receive a quantity discount of 15 per cent. For payment in cash a 1 per cent. discount is given to all customers, and no customer under any circumstances receives any greater quantity discount than 15 per cent.

The orders entered against the petitioners were the same in form and directs them to cease and desist—

"(1) From discriminating in price between purchasers operating separate units or retail grocery stores of chain systems and purchasers operating independent retail grocery stores of similar kind and character purchasing similar quantities of respondent's products, where such discrimination is not made on account of difference in the grade or quality of the commodity sold, nor for a due allowance in the difference in the cost of selling or transporting, nor in good faith to meet competition in the same or different communities.

"(2) From giving to purchasers operating two or more separate units or retail grocery stores of chain systems a discount on the gross purchases of all the separate units or retail stores of such chain system, where the same or a similar discount on gross purchases is not allowed or given to associations or combinations of independent grocers operating retail grocery stores similar to the separate units or stores of such chain system."

A chain store referred to in this proceeding is regarded as a series of two or more retail stores owned by one person or corporation. The quantity discounts allowed to owners of chain stores are computed upon the purchase of the owner of the chain for all his stores, and quantity discounts computed at the same rates are allowed to the owner of a single store. In practice, the retailer owning one store must meet the competition of the branches of the chain stores, whose owner, because of the volume of his purchases for all his units or stores in the chain, obtains a greater discount than does the owner of the one store who does not use the same volume, and therefore does not buy in such quantities. The disadvantage is sought to be corrected by respondent, by requiring the petitioners to (1) base chain store discounts upon the quantity delivered to each store, treating each branch of the chain as a separate purchaser or owner; or (2) to allow separate and individual purchasers or owners to pool their purchases for the purpose of computing discounts. It is found as a fact—

"That the respondent [National Biscuit Company] is the largest single producer of such bakery products in the United States; that the total value of respondent's products for the year 1914 was approximately $46,143,210, whereas the total value of production in the biscuit and cracker industry in the United States for the same year was approximately $89,484,000. Figuring the same in percentages, the National Biscuit Company, for the year 1914, had approximately 51.6 per cent. of the biscuit and cracker business in this country; that the value of respondent's products for the year 1919 was approximately $101,707,597, whereas the total value of production in the biscuit and cracker industry in the United States for the same year was approximately $204,020,000. Figuring the same in percentages, the National Biscuit Company, for the year 1919, had approximately 49.9 per cent. of the biscuit and cracker business in this country; that the total value of respondent's products for the year 1921 was approximately $104,836,255, whereas the total value of production in the biscuit and cracker industry in the United States for the same year was approximately $187,509,000. Figuring the same in percentages, the National Biscuit Company, for the year 1921, had approximately 55.7 per cent. of the biscuit and cracker business in this country; that east of the Mississippi river, for the year 1921, the National Biscuit Company had approximately 64.1 per cent. of the biscuit and cracker business.

"The respondent has, in the various states of the United States, 28 cracker bakeries and 8 bread bakeries, and has sales agents established in more than 192 different cities. Quoting from the testimony of Albert B. Bixler, respondent's general sales manager: 'They are from Portland, Me., to Portland, Or., and from Duluth to New Orleans, scattered over all the country.' In 1921 the respondent had approximately 248,487 customers. Nearly every grocer in Greater New York handles respondent's products, and in the District of Columbia and the vicinity thereof, out of 2,000 grocers, every one of them carried National Biscuit Company's products. Similar conditions exist in many cities of the United States. 'Uneeda Biscuit' is a cracker manufactured and sold by respondent, and is the fastest selling cracker in the world."

The Loose-Wiles Biscuit Company does about 15 per cent. of the cracker and biscuit business in the United States. It is also found that the cracker and biscuit sales represent from 1 to 3 per cent. of the grocers' total business.

[2] Error is assigned in the finding that the petitioners are engaged in interstate commerce. It is argued that the transactions affected by the order of the Commission are solely between agencies of the petitioners and retail merchants located adjacent to other branches within a state, and therefore the respondent was without jurisdiction. The petitioners admitted in the answer filed that they were engaged in interstate commerce, as charged in paragraph I of the complaint. There is some evidence that biscuits and crackers which are manufactured in one state are shipped without that state and to another within the United States in competition with other firms and corporations similarly engaged. Since this conclusion of fact has some support in the evidence, we must regard it as binding upon us. Federal Trade Commission v. Curtis Pub. Co., 260 U. S. 568, 43 Sup. Ct. 210, 67 L. Ed. 408. We do not, however, regard the existence of this interstate commerce as material to the present litigation.

Section 5 of the Federal Trade Commission Act (38 Stat. 717), provides that unfair methods of competition in commerce are declared unlawful and the Commission is empowered to order a person, partnership, or corporation to cease and desist from using such unfair methods in commerce. The finding of the Commission as to the facts, if sup-

ported by testimony, is conclusive on the review in this court. The Supreme Court said as to the conclusiveness of the findings of the Commission in the Curtis Publishing Company Case, supra:

"Manifestly, the court must inquire whether the Commission's findings of fact are supported by evidence. If so supported, they are conclusive. But as the statute grants jurisdiction to make and enter, upon the pleadings, testimony, and proceedings, a decree affirming, modifying, or setting aside an order, the court must also have power to examine the whole record and ascertain for itself the issues presented and whether there are material facts not reported by the Commission."

Section 2 of the Clayton Act, which is declared to be an act to supplement existing laws against unlawful restraints and monopolies and for other purposes (38 Stat. 730 [Comp. St. § 8835b]), provides:

"Sec. 2. That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities, which commodities are sold for use, consumption, or resale within the United States or any territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce: Provided, that nothing herein contained *shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity* of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition: And provided further, that nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade."

[3] The gravamen of the offense or the unfair method is the granting of discounts to purchasers of quantities as above referred to. The Commission does not find that the respondents have a monopoly, nor that they intend by unlawful means to obtain one. It is not charged or found that the petitioners have an agreement or understanding of any kind as to the creation of a monopoly or, indeed, the maintenance of a sales policy for such a purpose. The law does not make mere size of business an offense or the existence of unexerted power an offense. It requires overt acts and trusts to its prohibition of them and its power to repress or punish them. It does not compel competition nor require all that is possible. United States v. U. S. Steel Corp., 251 U. S. 417, 40 Sup. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121; United States v. United Shoe Machinery Co., 247 U. S. 32, 38 Sup. Ct. 473, 62 L. Ed. 968. In the first case it was held to be lawful for a single corporation to control 50 per cent. of the steel industry, and in the latter it was said to be lawful for a single corporation to control substantially all the shoe machinery industry. Size alone does not create a monopoly.

In many instances, each branch of the chain stores is a distinct and separate purchaser; petitioners solicit and take orders and make deliveries to each unit of the chain, and it is found that in some instances the owner of but one store is in competition with a branch of a chain that handles no more of the companies' goods in a month than does the owner of but one store, and the unit of the chain store receives a discount. It is found that the cost of selling and delivery is the same.

This is said to be the disadvantage in competing with chain stores and the various owners have pooled their orders because they do not carry on a large enough business to obtain the discounts. But the petitioners refuse to grant the discounts for such pooled or combined orders, and it is found that:

"An undue advantage in competing with the owners operating but one retail store in the handling of respondent's [petitioner's] said products, which practices have the capacity to and do tend to substantially lessen competition and create a monopoly in the retail distribution of respondent's [petitioner's] products."

And the Commission says that (1) they "are all to the prejudice of the public"; and (2) they "are all to the prejudice of said respondent's competitors." This court announced in Standard Oil Co. v. Federal Trade Commission, 273 Fed. 478, 17 A. L. R. 389, that:

"It may be admitted that one function of the Trade Commission is to discern and suppress such practices in their beginning; but a thing exists from its beginning, and it is not a conclusion of law from any facts here found that a system which at present is keenly competitive, extremely advantageous to the public, and, in the opinion of a majority of the competent witnesses, economical, is at present unfair to any one or unfair because tending to monopoly. A tendency is an inference from proven facts, and an inference from the facts as found by the Commission is a question of law for the court."

In Mennen Co. v. Federal Trade Commission (C. C. A.) 288 Fed. 774, certiorari denied 262 U. S. 759, 43 Sup. Ct. 705, 67 L. Ed. 1219, a charge was made against the petitioner which sold its products to wholesalers, retailers, and co-operative corporations of retailers who practiced unfair methods of competition in violation of the Trade Commission Act and of section 2 of the Clayton Act, in that they refused to grant to co-operative corporations of retailers or to retailers therein, discounts as large as those granted wholesalers. One of the charges against the petitioner there was that the practice of varying discounts, irrespective of the quantity and quality tended unduly to hinder competition between distributors of the respondent's products to retailers or directly to the consuming public. This court set aside the Commission's order and announced:

"In this case, as in the Gratz Case, the complaint contains no intimation that the Mennen Company has any monopoly of the business of manufacturing and selling toilet articles, or that it has the ability or intent to acquire one. So far as appears, the Mennen Company, acting independently, has undertaken to sell its own products in the ordinary course, without deception, misrepresentation, or oppression, and at fair prices, to purchasers willing to take them upon terms openly announced. In this case, as in the Gratz Case, nothing is alleged which would justify the conclusion that the public suffered injury or that competitors had reasonable ground for complaint. The allegation that its practice of varying discounts tended unduly to hinder competition between distributors of respondent's products to retailers or directly to the consuming public is a pleader's conclusion. The acts complained of in this case are not those which have heretofore been regarded as 'opposed to good morals because characterized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly.' And as said in the Gratz Case: 'If real competition is to continue, the right of the individual to exercise reasonable discretion in respect of his own business methods must be preserved.'"

299 F.—47

[4] Whatever may be the exact meaning of the phrase "unfair methods of competition," it is now settled that it is for the courts and not the Commission to determine as a matter of law what is and what is not included in the phrase. This rule is not voided by stating as a finding of fact what is a mere conclusion of law. Federal Trade Commission v. Gratz, 253 U. S. 421, 40 Sup. Ct. 572, 64 L. Ed. 993; Standard Oil Co. v. Federal Trade Commission (C. C. A.) 273 Fed. 478, 17 A. L. R. 389; N. J. Asbestos Co. v. Federal Trade Commission (C. C. A.) 264 Fed. 509, 18 A. L. R. 546. It is very apparent that no cracker manufacturer could be prejudiced by the refusal of his largest rival to satisfy customers or prospective customers by granting the discounts desired. Such a refusal could only have the effect upon a competitor of driving the dissatisfied customer to it. In this regard, there is nothing to indicate that the public was in any way prejudiced by the discounts. There is no claim that the owners of chain stores are not competing one with the other, or with other retail grocers, including those who have pooled or combined for ordering purposes; and there being no allegation or suggestion of any agreement or understanding among manufacturers, it is evident that the public purchases its bakery products in an open competitive market as respects both manufacturer and distributor. The only pools or combinations are among the grocers, who seek to combine for ordering purposes. The practice of giving discounts is permitted under section 2 of the Clayton Act, where it is provided:

"That nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition."

[5] The holding below does not say that the size of the petitioner's business was attained or contributed to by unfair or unlawful methods, or that it had any monopoly or control of the biscuit or cracker business, nor that it does injure its competitors or restrain trade among them. No conspiracy is alleged or proven. Indeed, the petitioner the Loose-Wiles Company has but 15 per cent. of the business; and there are many smaller cracker and biscuit manufacturers throughout the country. It is the exclusion of others from the opportunity of doing business that is regarded as monopolizing. Patterson v. United States, 222 Fed. 599, 138 C. C. A. 123. It has been said that size may increase trade and may benefit the consumer. United States v. Keystone Watch Case Co. (D. C.) 218 Fed. 502. There is a finding that the petitioners have extensively advertised, and have created a great demand for their products throughout the United States, and now the Commission concludes that:

"In many localities the demand for such products is so great that it is impossible for a retail grocer to successfully conduct his business if he does not handle respondent's products."

Even though the manager of the branch store of a chain exercises the fullest discretion in determining what and how he will purchase

from the company, and that the salesmen and deliverymen of the company spend as much time and effort in the branch store of the retail grocer as in the store of the so-called independent or individual grocer, it cannot be said that the branch store of the chain retailer is a separate or different purchaser as intended by section 2. It is undeniable that the manager of a branch of a chain store system, who may have the fullest individual authority in dealing with the salesmen or deliverymen of the petitioner, is nevertheless an employee or agent of the owner of the chain system, and cannot be regarded as a different purchaser. The indebtedness is incurred by the company, the payment is made by it, and the goods are delivered to it. It may be that the cost of selling the chain is the same as the cost of selling to the owner of but one store; but that does not sustain the charge of price discrimination, for there is no provision in the Clayton Act, or elsewhere, that the price to two different purchasers must be the same if it cost the seller as much to sell one as it does to the other.

The provision of section 2 of the act as to the difference in the cost of selling is merely one of the many separate and distinct permissive exemptions in that section expressly declaring price determination to be lawful if within the particular exception. Equal opportunity is given to all, in the discount system of petitioners' business. The determining factor is the quantity consumed; there is no discrimination among purchasers. All are supplied on equal terms according to the quantity purchased. While the chain stores have grown in numbers, this record demonstrates that there are thousands of retail grocers who are carrying on their business in one store. The discount plan was designed for the individual dealer, as well as for the large chain store owner. It is the right of a merchant engaged in private business freely to exercise his own independent discretion as to the parties with whom he will deal. Federal Trade Commission v. Raymond Bros.-Clark Co. (C. C. A.) 280 Fed. 529; Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co. (D. C.) 224 Fed. 566. The only injury claimed as a result of the petitioners' acts comes after the retailer has the biscuits or crackers and is disposing of them at retail. Then it is said one retailer has an undue advantage over another of the same competing class. But we said in the Mennen Case:

"This substitution in the final stages of the Clayton Bill of the clause to which we have referred plainly indicates the intent of Congress to exclude from the operation of the section [section 2] mere competition among 'purchasers' from the 'seller' or 'person' who allowed or withheld the discount, and to include therein only competition between such 'seller' or 'person' and the latter's own competitors."

This section can have no application, unless the unfair act substantially lessens competition or tends to create a monopoly in any line of commerce. It was never intended by Congress that the Trade Commission would have the duty and power to judge what is too fast a pace for merchants to proceed in business and to compel them to slow up. To do so would be to destroy all competition except that which is easy. Congress intended to eliminate all varieties of fraudulent practices from business in interstate commerce. Sinclair Refining Co. v. Fed-

eral Trade Comm. (C. C. A.) 276 Fed. 686. "The great purpose of both statutes was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain; and to this end it is essential that those who adventure their time, skill, and capital should have large freedom of action in the conduct of their own affairs," said the Supreme Court in Federal Trade Commission v. Sinclair Refining Co., 261 U. S. 463, 43 Sup. Ct. 450, 67 L. Ed. 746.

[6] Effective competition requires that merchants have freedom of action in conducting their own affairs. To be successful may increase or render insuperable the difficulties that rivals must face, but it does not constitute reprehensible or fraudulent methods. Federal Trade Commission v. Curtis Pub. Co., 260 U. S. 568, 43 Sup. Ct. 210, 67 L. Ed. 408. The method of competition, to be condemned as unfair, should be characterized by fraud, deception or oppression. Federal Trade Comm. v. Curtis, supra; Federal Trade Comm. v. Gratz, 253 U. S. 421, 40 Sup. Ct. 572, 64 L. Ed. 993; N. J. Asbestos Co. v. Federal Trade Comm. (C. C. A.) 264 Fed. 511, 18 A. L. R. 546; Silver Co. v. Federal Trade Comm. (C. C. A.) 289 Fed. 985.

In its complaint the Commission charged that the practices were all to the prejudice of the public. It does not make any specific finding as to this. The practice of discounts is not an unfair method of competition under the statute, unless it is prejudicial to the public. The intent of the act is the prevention of injury to the general public, and what forms the basis of the proceeding is that it deceives the public, or that it was unfair alike to the public and to the competitors. Royal Baking Powder Co. v. Federal Trade Comm. (C. C. A.) 281 Fed. 744; N. J. Asbestos Co. v. Federal Trade Comm. (C. C. A.) 264 Fed. 510, 18 A. L. R. 546.

We conclude that the sales policy of the petitioners, as to their discount plan, as well as the refusal to sell co-operative or pooling buyers, is fair in all respects as to all its competitors and customers. This policy obviously does not affect the public interest, nor deprive it of anything it desires. It is a practice which is recognized by manufacturers of bakery products and is inoffensive to good business morals. It was error to direct the petitioners to sell to individual grocers, who pooled their orders of purchase, or who bought on a co-operative basis. While a chain store owner may handle more crackers, because of his ownership of more than one store, this is but the result of healthy competition. A manufacturer of biscuits cannot be expected to adopt a uniform policy that is appropriate to meet the small buyer and the large buyer. There is no discrimination between the large buyer, such as the owner of a chain store, and the grocer owning but one store.

There is evidence in the record that many individual grocers do a large enough business to win the discount provided for under the petitioners' policies. A pool is organized merely to buy, and not for selling purposes. The manager of the pool, when it has a manager, merely buys as an agent or employee of the pool. He has no control over any of the various grocers in the pool. He incurs no financial liability. Each member of the pool controls his own business, and is liable for

his own indebtedness. The case is different where the sale is made direct to the manager of a chain unit. By pooling purchases, the retail customers of the petitioners would afford no service in the sale of the petitioners' product to the consumers, beyond that which each furnishes individually, and it may be noted that the advertising of the large chain stores inures to the benefit of the petitioners' products, by creating a widespread and uniform demand for their products and consequently larger sales.

For these reasons, we regard the orders below, entered against each of the petitioners, as improvidently granted, and the orders complained of are reversed.