**UNITED STATES v. KLEARFLAX LINEN
LOOMS, Inc.**
**Civil No. 429.**

District Court, D. Minnesota,
Fifth Division.

Sept. 6, 1945.

NORDBYE, District Judge.

Melville C. Williams and Urban A. Lavery, Sp. Assts. to Atty. Gen., and Victor E. Anderson, U. S. Atty., of St. Paul, Minn., for plaintiff.

Rollo F. Hunt and Hunt, Palmer & Hood, all of Duluth, Minn., for defendant.

Klearflax Linen Looms, Inc., hereinafter referred to as Klearflax, is the only manufacturer of linen rug material in the United States. Its principal place of business is in Duluth, Minnesota. The linen rug material is manufactured from flax straw, generally in strips or rolls approximately 100 feet in length and from 26 inches to 12 feet in width. For some years, Klearflax has set up a method or system of distribution and sale of its linen rug rolls through distributors, jobbers, and certain retail stores appointed in various cities of the United States. District sale representatives of the company are also located in cities, generally in which the principal distributors are located. The rolls of linen rug material are sold to the distributors, who cut them into required rug sizes and finish them by binding the cut edges and fringing them when necessary. The finishing of the rugs in this manner is not performed exclusively by Klearflax distributors, but since 1941 Klearflax has encouraged its distributors and certain other customers to fabricate the rug rolls into finished rolls, and thus relieve the factory of this work. However, Klearflax does some finishing of the rugs at the factory, and these rugs are sold to its customers, including distributors, jobbers, retail stores, and government agencies.

The history of Klearflax's monopoly in the manufacture of linen rugs is free from any wrongful domination, illegal combination, or wrongful destruction of the business of other competitive manufacturers. Anyone is free to manufacture linen rugs, and Klearflax has no patent rights which enter into their manufacture, nor does it control any secret processes which enable it to be the exclusive manufacturer. Neither does it appear that the amount of capital necessary to enter into the linen rug manufacturing industry is in any way prohibitive. It seems clear, therefore, that Klearflax's singular position as the sole manufacturer of linen rugs is not due to any baleful practices on its part.

It does appear that linen rugs have some unique features which render them distinctive and probably more durable for certain uses than other floor coverings. They are reversible, easily cleaned, moth-proof, and they will not burn, except superficially by reason of lighted cigarettes being dropped upon them. Rugs of other material, however, are in active competition with Klearflax's product, and undoubtedly there are rugs other than linen rugs which, to some degree, at least, possess the same distinctive qualities referred to. However, it is evident that linen rugs are in demand by hotels, office buildings, and public buildings. It appears that the total amount of Klearflax's annual production approximates in volume one million dollars, and is less than one-half of one per cent of the total rug business in the entire Nation.

The Procurement Division of the Treasury Department of the United States usually advertises for bids on finished linen rugs once or twice a year. The name, address, and contract price of the successful bidder are published in what is termed a "General Schedule" issued by the Treasury Department and circulated to all Federal executive departments and agencies interested in purchasing linen rugs. Any department or agency of the Government may then order finished linen rugs from the successful bidder at the contract price reflected therein. Such contract is generally referred to as the "General Schedule Contract." From 1934 until April 1, 1944, Klearflax was the only bidder on the General Schedule Contract let by the Procurement Division for the purchase of linen rugs by the various Federal agencies. While the amount of the General Schedule Contract is only about five per cent of the total annual business of Klearflax, the amount of government business which comes to the holder of the contract totals approximately thirty per cent of Klearflax's annual production. Moreover, the government business which comes to the successful bidder is usually handled on the prices reflected in that contract. Hence, the higher the bid on the General Schedule, the higher the return to the successful bidder on the other government business which comes to it.

As hereinbefore stated, the distributors appointed by Klearflax were located in various cities throughout the United States. A certain area adjacent to the distributor's place of business was considered to be the territory where it should operate, but apparently the assignment of territory in this regard was not rigid. Each distributor received a discount from Klearflax of 20 per cent, plus 5 per cent, and an additional 5 per cent in the event of payment within 10 days. Jobbers usually buy their Klearflax rugs from distributors, and receive a less discount than the distributors receive from the manufacturer. There were no restrictions placed upon the distributors, jobbers, or retail stores in selling Klearflax products to governmental agencies. So far as the evidence indicates, they were always permitted, not only to sell to any government agency, but to enter a bid on the General Schedule Contract.

Floor Products, Inc., is located in Chicago, Illinois, and has been a distributor of Klearflax products since 1938. In 1942, it became a duly appointed distributor of linen rugs, with its territory in general in the so-called Chicago trade area. Since 1942, as such distributor, Floor Products purchased rug rolls from Klearflax and did the necessary fabricating or finishing so as to be enabled to deliver the finished rugs to its customers. In 1943, it purchased floor coverings from Klearflax totaling some $32,000 and was the sixth in volume of the eleven distributors who were buying from Klearflax during that year. The demand for linen rugs far exceeded the supply made available by Klearflax, and in 1942 Klearflax adopted a so-called allocation system. The total shipments for the ensuing year were estimated, and the Eastern division of the United States was to receive 45 per cent, the Central division 30 per cent, and the Western division 25 per cent. These percentages were not broken down among the distributors, but it would appear that in 1943 a rough estimate or approximation was made out as to the probable amount of merchandise each distributor would receive. However, Klearflax made no commitment to any distributor, though it fairly appears that it attempted to allow for allotment for the year 1944 about the same volume of merchandise which the particular distributor had received during the year 1943.

Early in February, 1944, Floor Products, without the knowledge of Klearflax, entered its bid on the General Schedule Contract for linen rugs for the period from April 1, 1944, to October 1, 1944. Klearflax also bid. The bid of Floor Products was about 4 per cent less per square yard than that of Klearflax. Floor Products also offered a discount of 2 per cent upon payment in 30 days. No discount was offered by Klearflax. It was on March 2, 1944, that Klearflax learned that Floor Products had submitted a lower bid on the General Schedule Contract. Immediately attempts were made by it to get Floor Products to withdraw its bid. It suggested to Floor Products that its bid should be withdrawn and advised Mr. Gronenberg, President of Floor Products, to telegraph the Procurement Division that its bid was withdrawn. Floor Products was informed by Klearflax that no distributor had ever bid on the General Schedule Contract before; that it was the private business of Klearflax; and that it did not want any interference with that line of business. It offered Floor Products a substantial increase in its monthly allotment if the bid

were withdrawn. Yielding to the insistence of Klearflax, Floor Products notified the Procurement Division in writing that its bid was withdrawn. However, Floor Products was notified by the Procurement Division that the bid could not withdrawn without sufficient reason, and upon being so informed Floor Products immediately conferred with Klearflax and advised it of the position taken by Procurement. Thereupon, Klearflax sought to induce Floor Products to wire the Procurement Division that it had made a mistake and had bid on Scandia rugs, which is a cheaper grade of floor covering material manufactured of linen and cotton. In some way, the suggestion that Floor Products had made a mistake came to the attention of Mr. Ballard, one of the officials of the Procurement Division, and upon inquiry as to whether its bid was on all-linen or Scandia rugs, Mr. Gronenberg replied that the bid of Floor Products was on all-linen rugs. Thereafter, Floor Products refused to go through with the attempted cancellation of its bid. Although Klearflax knew that Floor Products bid on linen rugs and that no mistake had been made, it attempted to get Floor Products to cancel the bid on the subterfuge that a mistake had been made. When Floor Products refused to be a party to that scheme, Klearflax attempted to get Floor Products to advise Procurement that it could not go forward with its bid because it had been advised by Klearflax that sufficient delivery could not be obtained. When it appeared that Floor Products refused to go forward with the suggested cancellation on the grounds urged by Klearflax, the latter set out on a concerted plan and scheme to "freeze" Floor Products out of the government business by refusing to sell it any linen floor coverings. On March 8, 1944, Floor Products sent to Klearflax an order for certain rolled goods, anticipating the granting of the contract by Procurement and notifying Klearflax that this order would have the required government priority. No response was made to this order by Klearflax until about March 18, 1944. Then, notwithstanding that, a short time prior thereto, Klearflax had promised Floor Products that it would make a substantial increase in its monthly volume if it would only cancel the contract, it wrote Floor Products as follows: "Production problems here are such that it is just impossible for us to predict whether or not we could ever fill this order for you."

A copy of this letter was sent by the General Manager of Klearflax to its Chicago sales representative with the following notation: "If Gronenberg calls you, remind him that he still has a chance to take care of things for us if he now changes his mind."

And to the representative at Washington, D. C., who had had negotiations with Mr. Ballard of Procurement, the following notation appeared: "Gronenberg still refuses to play ball with us so perhaps this letter may get him to change his mind. I do hope he does before April 1st so that Ballard can make the necessary changes in the Schedule."

It is quite apparent from the correspondence that Klearflax had not given up hope to get a successful cancellation of the contract and sought to achieve that end by notifying Floor Products that no delivery could be promised on the merchandise necessary to fill the government order. The General Schedule Contract was formally awarded to Floor Products on March 25, 1944, and when Klearflax learned of that fact, it definitely decided that no further merchandise should be delivered to Floor Products, either for the purpose of filling the government contract or for civilian use. On April 4, 1944, the General Manager of Klearflax wrote to its Eastern representative as follows:

"Find out from Ballard just what steps he will have to go through when he finds out that Floor Products cannot deliver on their bid.

"Ballard may then want to give the bid to Klearflax, who was the next highest bidder, or he may want to call for new bids entirely."

Klearflax made no deliveries of rug material whatsoever to Floor Products in the month of April, 1944. Material approximating $500 in value was delivered in the month of May; none was delivered in the month of June; and an order totaling $14.78 was delivered in the month of July. In that Floor Products could not buy any material from Klearflax, serious delays were occurring in the deliveries under the General Schedule Contract, and it attempted to obtain Klearflax material from the various distributors throughout the United States. It asked them to fill the General Schedule orders in their particular areas at

the same prices Floor Products was to receive under the General Schedule Contract; that is, the deliveries under the contract would require Klearflax rugs to be shipped to various parts of the United States to supply governmental agencies, and the distributors in the particular areas were asked to fill the orders at the same price that Floor Products was to receive under the contract. Several distributors replied, either accepting the offer or asking for further details. When Klearflax learned of the attempt of Floor Products to fill the government contract in this way, its General Manager wrote to one of the distributors as follows:

"Gronenberg did not come to us at all about any additional allotment for this government business and so far I have refused to give him any. We have had several talks about it and Gronenberg knows definitely that he is not going to get any Klearflax from us to fill those Schedule orders so now he is trying to get it from our other distributors.

\* \* \* \* \*

"My plan is to definitely freeze Floor Products out of this government business with the hope that the General Schedule Bid will then be given back to us at least by next September 1st.

"Before the next bids go in, I will notify all of our distributors that we intend to keep this small amount of government business direct and ask their cooperation by not bidding on it. I believe all of them will do that for us.

"So please ask Nesbitt (of Coast Carpets) to tell Floor Products that they would rather use their allotment in their own territory on their own orders.

\* \* \* \* \*

" \* \* \* Keep in mind that we will not increase any distributor's allotment to take care of any of this business for the Government."

Other distributors were informed by Klearflax of its refusal to sell Floor Products and their cooperation was requested. It followed, therefore, that no distributor would accept any of Floor Products' orders, and the latter's attempt to obtain merchandise in this manner so as to carry out its contract with the Government proved abortive. Thereafter, Klearflax returned all the orders that had been sent in by Floor Products with a letter of transmittal ironically stating the reason for its inability to

fill the orders as follows: "It is too bad that our production is so limited this year."

During the latter part of June, 1944, the Navy Department communicated direct with Klearflax with respect to the delay which had taken place in filling its priority orders with Floor Products. These orders had been entered through the Procurement Schedule. It was about this time that the government investigation entered into the situation. The Procurement Division complained to Klearflax with reference to its failure to sell Floor Products and insisted that it could see no reason why Klearflax could not make available to Floor Products the production that it must have contemplated when Klearflax entered its bid on the government contract. These negotiations led to a plan whereby Klearflax finally agreed to fill the orders under the General Schedule Contract. It required Floor Products to pay in advance of each shipment the amount due it. Its entire attitude indicated an intention to make it as difficult for Floor Products as possible, and in reluctantly filling the government orders it was not actuated by any change in its determination to drive Floor Products out of the General Schedule Contract business. The honoring of Floor Products' orders under the General Schedule Contract from April 1st to October 1, 1944, was carried on as indicated, and apparently this contract has been fully executed.

During August, 1944, the Procurement Division requested bids from Klearflax and Floor Products on the ensuing General Schedule Contract to be let for the period of October 1, 1944, to September 30, 1945. Both parties entered bids and the contract was again awarded to Floor Products as the lower bidder. When Klearflax learned that Floor Products had been successful again in obtaining the General Schedule Contract, it did not state or indicate that it would refuse to sell products to Floor Products, but in carrying out its plan to freeze the latter out of the General Schedule Contract business, it is fair to find that it removed Floor Products as a distributor and designated it as a jobber. As a jobber, it is not accorded the same discount which is allowed the distributor. Generally, the fabricating or finishing of the rolled goods is done by the distributors, and the jobber buys the finished line of floor covering material. Obviously, its status as a jobber places it in a less favorable position to compete successfully with

Klearflax or the other distributors on the General Schedule Contract.

While there is some dispute in the evidence as to the response which Floor Products in its status as a jobber received from the distributors in endeavoring to purchase Klearflax rugs from them, it does appear that, after the complaint herein was filed on November 24, 1944, Floor Products has been able to buy Klearflax rugs from the distributors, and in part, at least, has been able to fill the orders under the General Schedule Contract. In October and November, 1944, however, it sent some 13 or 14 orders to Klearflax direct, which were returned with directions to Floor Products to place its orders through regularly designated distributors. Delays occurred in filling orders under the General Schedule Contract, and some 15 orders were cancelled by the Navy in December, 1944. It is not clear whether the delay was due to the lack of cooperation on the part of the distributors and Klearflax, or from Floor Products' attempt to have orders filled at the mill, as it was authorized to do before it had been demoted to a jobber. Probably both factors contributed to the delay.

It is evident from the factual picture herein that Klearflax sought to monopolize the sale of linen rugs in interstate commerce to the United States under the General Schedule Contract. Not only did it set out to prevent Floor Products from competing with it, but it also successfully dissuaded other distributors, jobbers, etc., from bidding on this government contract. Klearflax, having a monopoly in the manufacture of linen rugs, had the power, and exercised it, so as to restrain any competition between itself and the distributors for this government business. Moreover, its actions directly tended to restrain any competition as between the distributors for such business. No other distributor, in light of Klearflax's attitude, would have had the temerity to make a bid on the government contract. But it is urged by the defendant that Floor Products was not its competitor, and neither was any distributor. It asserts that it could sell or refuse to sell its products to any one or all of its customers, and that it had the inherent right to select its own customers. It points out that Floor Products could not fill either the first or second government contract of 1944 with merchandise that Floor Products had on hand, but that this distributor had to depend on the merchandise which it could obtain from Klearflax in order to carry out its contract with the Government. It emphasizes that Floor Products had no contract or other enforceable right whereby it could require the delivery of any specified amount of linen rug material from Klearflax. Therefore, it earnestly contends that Floor Products was not a competitor, either actual or potential, and unless it was a competitor it must follow that competition was not stifled or crushed by any of the acts complained of herein. In support of its position, Klearflax asserts that it could abolish all of its distributors and jobbers and handle its own sales without violating the Sherman Act; that it created the present system of distributors and jobbers as an outlet for its merchandise, and it must follow that it could therefore abolish the entire system or any part of it without liability under the Sherman Act. It takes the position that, if in order to enhance its own returns, it restricted or curtailed its sales to one who intended to encroach on the business of a lucrative customer, it in no way ran afoul of Section 2 of the Sherman Act, but was pursuing a perfectly lawful business practice.

█ The contentions of the defendant pose some difficult questions and it may well be that they are not free from doubt. After considerable reflection and consideration, however, the Court is of the opinion that Klearflax's position and contention that Floor Products was not a competitor for the business contained in the General Schedule Contract should not be sustained. At the outset, it seems necessary to emphasize that, in order to obtain a market for its product, Klearflax set up a nationwide plan whereby it would be enabled to enjoy the Nation's market. It designated distributors and jobbers in most of the large cities in the United States. The greater part of the finishing of rugs was done by the distributors at Klearflax's request, and a large bulk of the business in the sale of linen rugs entered into the channels of interstate trade. No restrictions or limitations were placed on the distributors with respect to sales to the Government. In fact, they were urged to obtain Army and Navy orders outside of the General Schedule Contract. Prior to Floor Products' bidding on the General Schedule Contract, there was no indication from Klearflax that such business was exclusively reserved to it. Floor Products, therefore, was fully authorized, not only

to sell to any agency of the Government, but likewise to enter its bid on the General Schedule Contract. It must be remembered that Floor Products was not a mere sales representative, but it purchased outright the rug rolls from Klearflax, finished them, and thus became the sole vendor of such material and could sell to any vendee except as it may have impliedly agreed to limit its activities to the so-called Chicago area. This latter restriction, however, did not pertain to government sales. True, it is not contended that Floor Products was not a competitor as to merchandise which it had bought and paid for. Klearflax relies exclusively on the proposition that, because Floor Products had to depend on Klearflax's furnishing the necessary merchandise with which to fill the contract with the Procurement Division and could not enforce any contract or other right to such necessary merchandise, it must follow that Floor Products was not a competitor for this business. However, it is clearly established that the only reason that Klearflax refused to sell Floor Products the normal and usual amount of merchandise, which it would have sold to it during 1944, was for the very reason that Floor Products was a competitor. When Klearflax insisted that Floor Products must wire Procurement and cancel its bid, it did so because it considered Floor Products as a competitor for this business. Moreover, when Klearflax obtained the cooperation and agreement of certain other distributors to refrain from selling Floor Products, so as to cripple the latter in its attempt to fill the contract, it did so because it deemed Floor Products to be its competitor. It is conceded that both companies were sellers of linen floor covering material. Realistically considered, therefore, all that Klearflax did to freeze out Floor Products from the government business was to destroy this unexpected competition. They were both seeking this government business, and Klearflax was determined that Floor Products should not obtain it. Were it not for the acts of Klearflax, it is entirely probable that Floor Products could have obtained the cooperation of other distributors and thereby obtained sufficient rug material with which to carry out the contract. While it is true that most of the distributors probably had insufficient merchandise on hand with which to fill any substantial orders which may have been forthcoming from Floor Products and that

they had to depend on Klearflax as their source of supply in this regard, it seems indisputable that Klearflax made it clear to the distributors that they should refrain from giving any assistance to Floor Products in its attempt to comply with this government bid. Klearflax's activities with reference to the other distributors were all directed to its plan to make it impossible for Floor Products to carry out its contract.

It is no answer to say that competition depended on Klearflax's will, and therefore there could be no unfair competition. The law will not countenance the attempted removal of Floor Products as a competitor if the removal was actuated solely by a plan and scheme to obtain an unlawful monopoly. The views enunciated in Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882 are helpful. There, Justice Holmes dissented from the majority opinion and held that there could be no competition when the Beech-Nut Packing Co. had a monopoly of its own goods with the full assent of the law; in other words, that competition depended entirely upon the will of the producer of Beech-Nut products. This view, however, was not the view of the majority of the court, and notwithstanding the monopoly which the defendant enjoyed, certain of its customers were held to be competitors even though their supply depended on the will of the defendant, and the court refused to uphold any contracts or combinations, express or implied, which unduly hindered or obstructed the free and natural flow of commerce in the channels of interstate trade. In United States v. Aluminum Co. of America et al., 2 Cir., 148 F.2d 416, it appeared that Alcoa, one of the defendants, was the sole supplier of aluminum ingots. However, it was held to be a competitor with the fabricators of aluminum sheets who bought ingots from Alcoa. Both Alcoa and the fabricators were manufacturers of aluminum sheets.

Nor will it avail the defendant to urge that it could discharge all distributors and jobbers and draw to itself the entire sales of its product. That situation is not now present. We are confronted with a situation where the products of Klearflax are flowing through the channels of interstate commerce by the efforts and sales of distributors, jobbers, and others. As long as that system of interstate distribu-

tion exists, no one can wrongfully monopolize that trade, and the monopoly which Klearflax rightfully enjoys as a manufacturer cannot be utilized for any illegal purpose. Klearflax has requested and used the aid of others in the distribution of its product, and as one of such distributors Floor Products had a right to carry on its business as a seller of linen floor coverings in interstate commerce, free from any monopolistic limitations. While Klearflax can select its customers and can refuse to sell to those with whom it does not desire to do business, it cannot refuse to sell if its design and purpose is to establish a wrongful monopoly. The prevention of competition herein was to enable Klearflax to fix a price for its linen rugs to the Government—a price that was higher than that charged to any distributor, jobber, or even to certain retail department stores.

▆▆▆ The fact that Klearflax's monopoly as the sole manufacturer is not tainted with illegality does not justify a monopoly in restraint of trade. Klearflax is not now being attacked as a monopoly in the manufacture of rugs. The action herein is solely directed to its attempted monopoly to restrain the free flow of commerce in interstate trade. Nor does the fact that linen rugs are not a necessity militate against a wrongful attempt to monopolize any part of that commerce. The purpose of the Sherman Act is to establish a free market in any kind of goods in interstate commerce where competitors may have a free opportunity to compete. The attempt of Klearflax, therefore, in light of the facts herein, to monopolize any part of such trade by refusing to sell, was wrongful. It is urged that Klearflax has a right to draw to itself any business which will enhance its own returns, but its acts were not directed to any legitimate business venture to enhance its own business, but rather was a designed attempt to monopolize the government business under the General Schedule Contract. In other words, it was not a legitimate business practice to attain a lawful end. A refusal to sell, while it may be lawful per se, cannot be used in order to achieve an illegal result.

Undoubtedly, linen rugs compete with other floor coverings which are available on the market and widely distributed, but the evidence does establish that Klearflax rugs are unique and distinctive. It is not without significance that the General Schedule Contract lists linen rugs separately from other floor coverings, and the government demand indicates their desirability, particularly for public buildings. It is quite evident that the Government prefers them for certain uses over other types of rugs and considers them as possessing certain distinctive advantages in government use which differentiate them from other floor covering material.

Reference is made by Klearflax to the language in Patterson v. United States, 6 Cir., 222 F. 599, wherein it was pointed out by the court that to successfully make a sale or sales to one or more purchasers could not result in a monopoly merely because the unsuccessful party or parties were excluded from the sale; that is, where there could be only one common occupation, by the very circumstances there could be no monopolization. This may be true, because competition necessarily contemplates that the successful vendor is to obtain the business that both the competitors seek, and a monopoly cannot be spelled out from such competitive practices. In the Patterson case, the court took pains to emphasize that to drive out all competitors by unfair and illegal means so that they could not compete constituted a monopoly, stating (page 620 of 222 F.) : "But, though but one competitor can make a sale, all competitors can enjoy the free opportunity of approaching each and every prospective purchaser on equal terms, with the chance of making a sale if he can persuade him to buy. *For one competitor to exclude all or substantially all other competitors from such opportunity—i. e., drive them from the field of freely offering their goods, so as to have that field to himself— is to monopolize according to the legal and accurate sense of the word.*" (Italics supplied.)

And at page 650 of 222 F.: "* * * One competitor has the right to try to sell by fair means all of his goods that he can, and if the effect of his selling is to drive another competitor out of the field he is not to blame. *But it is wrong for one competitor to want to drive another competitor from the field by unfair or illegal means, and to take steps to that end, so that he may have the field free from such competition and thereby be enabled to sell his goods.*" (Italics supplied.)

▆▆▆ It seems obvious that a distinction must be made between the making of a sale or sales, thus drawing to the successful

seller the customers involved, and a studied attempt to exclude others unfairly by making it impossible for them to compete and thus prevent them from dealing in a free market. The mere fact that the Government is only one customer should not change the principles enunciated. The business of the Government in buying linen rugs under the General Schedule Contract extends from coast to coast, and it has amounted to approximately thirty per cent of defendant's annual production. Certainly, it must be classified as a part of interstate commerce, which fairly comes within the purview of the Sherman Act in that regard.

The defendant asserts that it was justified in refusing Floor Products any merchandise with which to fill the government contract because it had failed to make any arrangement for an allocation of the merchandise necessary to fill this government order. It may be pointed out in passing, however, that Klearflax must have contemplated an allocation of the necessary products with which to fill these very orders, because it had bid on the General Schedule Contract. But that aside, it appears that Klearflax, in carrying out its plan and scheme to drive Floor Products out of this government business, refused to deliver the normal and usual amount of linen floor coverings that Floor Products would have received in the normal and usual course of its business in 1944, and its refusal to honor Floor Products' orders during this year was a part and parcel of its illegal plan and scheme. The delivery in 1944 of substantially the same amount of rug rolls that it had received in 1943 would have enabled Floor Products to take care of substantially all of the listed orders under the General Schedule Contract, but not the other government business which generally comes to the successful bidder. Floor Products' bid on the General Schedule Contract totaled about $37,000. The amount of its purchases from Klearflax in 1943 totaled $32,702.46. The refusal of Klearflax during the months of April, May, and June, 1944, to deliver any substantial amount of merchandise to Floor Products, on the pretext that no arrangement had been made for an allotment to fill the government orders, was not in good faith. Its concern was not that Floor Products had made no arrangements for merchandise for the Government's order, but it was apprehensive that the delivery of any merchandise might cause a failure of its plan to drive Floor Products out of this business.

Reference is made to the fact that the first General Schedule Contract was finally filled through the cooperation of Klearflax and that now the distributors are selling to Floor Products under the same arrangement which is accorded to any jobber. But the belated aid given Floor Products in July, 1944, was in no way attributable to a change of heart or abandonment of Klearflax's plan to monopolize. It was the result of the intervention of the Navy Department and the investigation of the Government. That Klearflax is continuing in its plan to prevent any distributor from competing with it in the government business was strikingly evidenced by its demotion of Floor Products to the status of a jobber. Various reasons are assigned by Klearflax as the basis for such action, but they are specious. Undoubtedly, the insistence of Floor Products in again bidding on the government contract and the cooperation that Mr. Gronenberg has evidently given to the Government in the present suit has resulted in a strained business relation between the two concerns. But if Floor Products had not insisted on going forward with the filling of the government contract, there is every reason to believe that it would have remained a distributor. First, Klearflax tried to freeze Floor Products out of the government business by refusing to sell it merchandise; then by obtaining the cooperation of the other distributors so that they would not sell Floor Products; and finally by reducing it to a jobber and thus making it exceedingly difficult for it to continue as a competitor. While it can be argued that the Government is receiving some merchandise from the competitor which the defendant sought to eliminate, the entire facts and circumstances unerringly point to the continuance of Klearflax's plan and scheme to attempt to monopolize this business. Certainly, such plan and scheme continued up to the time that this action was commenced.

Substantially all of the decisions arising under the Sherman Act stress the necessity of appraising the particular facts and circumstances of each case in light of the purposes of the Act. It is generally indicated that the Act should be liberally construed, having in mind its beneficent purposes for the public weal. If, as

stated in United States v. Whiting, D.C., 212 F. 466, at page 478, "An attempt to monopolize means an attempt to get control of the industry in which the defendant is engaged 'by means which prevent other men from engaging in fair competition with him,'" and if, as stated in Peto v. Howell, 7 Cir., 101 F.2d 353, at page 358, "Monopoly is the acquisition of something for one's own self, not necessarily the whole of a given commodity or the whole commerce therein but control, at least, of a part thereof sufficient to constitute withholding from the public the right to deal therein in an open market," then it would seem that the undisputed facts herein establish a violation of the Sherman Anti-Trust Act. It seems too clear for argument that Klearflax attempted to exclude Floor Products from the opportunity of doing business with the Government on its General Schedule Contract; that is, monopolizing according to National Biscuit Co. v. Federal Trade Commission, 2 Cir., 299 F. 733, 738, wherein the court defined monopolizing as follows: "It is the exclusion of others from the opportunity of doing business that is regarded as monopolizing."

Perhaps the more troublesome question arises when the extent of the relief to be granted is considered. While Klearflax's conduct in attempting to drive Floor Products out of the government business referred to was most high-handed and indefensible, there are some practical aspects of the situation which should not be overlooked. The demands of the Government for Klearflax products at this time are abnormal and they probably will soon subside. Under normal conditions, Klearflax must depend largely on civilian business for its outlet. Civilian business cannot be entirely ignored at the present time or Klearflax may find itself without any customers upon which to expand its postwar business. It fairly appears that Klearflax's allocation of merchandise to its distributors was arranged with this purpose in mind. If there had been no wrongful attempt to monopolize, and Klearflax had delivered to Floor Products during the year 1944 the normal amount of merchandise which it would have received in the ordinary course of business, but limited Floor Products accordingly, notwithstanding that it was a successful bidder on the General Schedule Contract, it is to be doubted that Floor Products would have had any cause to complain or that any wrongful stifling of competition would have occurred by reason of such limitation. Klearflax had the right to so distribute its output that it was allocated equitably to its dealers, and if one dealer could obtain a large contract and thereby substantially exhaust Klearflax's supply, this might not only be detrimental to the other distributors, but might injure Klearflax's civilian business, which should be cultivated and maintained. The suggestion that Klearflax was a bidder on the government contract in 1944 and thus must have had available, or facilities to make available, sufficient merchandise to fill the orders contemplated, and the Government's contention that such merchandise should have been made available to the successful bidder regardless of the amount, may not offer a practical solution. In years to come, Klearflax may not always be a bidder, and even though it continues to be a bidder, the allocation to one distributor of merchandise far in excess of that which would be allocated to the other distributors, may disrupt its entire system of distribution and cause neglect of certain civilian business. It would seem that Klearflax has the right to expect its distributors to further their civilian business in the particular areas where they may be located. It does not appear that Floor Products necessarily neglected its civilian business because it centered its attention on the government contract in 1944. That situation may not apply to other distributors who are the sole source of supply of Klearflax's products in their particular areas; that is, there were other distributors in the Chicago area besides Floor Products. But this may not be true in other areas where distributors are appointed. It would seem, therefore, that Klearflax might be justified in limiting the amount of merchandise to each distributor, even though such limitation might make it difficult for such distributor to compete for all available government business under the General Schedule Contract, if such limitation was the result of legitimate business policies on the part of Klearflax and not the result of an attempt to monopolize any part of interstate trade or commerce. It might be feasible for the Government to get competitive bidding on smaller allotments from Klearflax and the distributors located in the particular area where the merchandise is to be used. If this were done, the distributor would probably be in a better position to compete. But without expressing any final view as to wheth-

er .Klearflax should be required to fill orders from its distributors for resale to the government agencies under the General Schedule Contract without limitation as to amount, the scope of the injunction as to that detail may await the further views of counsel when findings of fact and conclusions of law and the proposed form of injunction are presented.

It seems clear from the foregoing, however, that Klearflax should be restrained at least from monopolizing, or attempting to monopolize, the sale of linen floor coverings in interstate commerce to the United States under the General Schedule Contract, or other forms of contract offered by the Government for linen floor coverings. It should be restrained from discriminating, or threatening to discriminate, against any of its distributors, jobbers, or customers in any manner whatsoever on account of any attempt or plan of such parties to bid on such government contract or contracts. It should be restrained from agreeing, or attempting to agree, with any of its customers upon any price which it or the customers will submit on a bid on any such government contract. It should be lrestrained from refusing to sell any distributor, jobber, or customer, or from refusing to sell any distributor, jobber or customer because of any bid, or attempt to bid, on such contract or contracts. It should be restrained from attempting to agree or agreeing with any of its distributors, jobbers, and customers that the parties will refrain from bidding, or will withdraw or modify any bids, for such business.

In order that all distributors, jobbers, and others may be informed of the injunctive relief granted herein, and the right to bid on the General Schedule Contract, or other government contracts for linen floor coverings, without any wrongful interference by Klearflax, the injunction should provide that a copy of the writ entered herein should be mailed by Klearflax by registered mail to each distributor and jobber, and any other customer who may be in a position to bid on the government contract. Moreover, an appropriate reservation of jurisdiction should be entered.

The Government contends that, in order to insure the effective termination of the monopolistic practices of Klearflax, it is imperative that Floor Products be specifically included in the injunction as one of the customers who may bid not only on the General Schedule Contract, free from the wrongful interference of the defendant, but may also purchase the necessary linen floor coverings from Klearflax to fill any successful bid that it may make on the General Schedule Contract on the same terms and conditions which are accorded to any other distributor; that is, the Government urges that, unless Floor Products is reinstated to its more favorable status as a distributor, with the right to purchase merchandise from Klearflax as such in order to fill any government contract awarded to it, there will be no real competition because other distributors may show a lack of interest or may perchance not have the temerity to compete with Klearflax under the circumstances. Generally speaking, the Court should be hesitant to require a vendor to sell to any person or concern when such vendor does not desire to include such person or concern as a customer unless it clearly appears that such action is necessary in order to insure free competition. United States v. Bausch & Lomb Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024. Bad feeling as between Klearflax and Floor Products has been engendered, of course, because of all the circumstances referred to herein. Many practical difficulties may arise if the Court assumes to enforce a close business relationship between two concerns if that desire is not mutual. Whether Klearflax products are to be classed as a near-luxury item may be questionable, but at least they find their market in the better than average income purchasers. There are some eleven distributors of Klearflax linen floor coverings throughout the United States, and ordinarily it would seem that that number should afford sufficient competition in bidding on any government contract for Klearflax products so as to protect the public rights. This Court is not concerned, of course, with the private rights of Floor Products in this proceeding. The Court has some doubts as to this phase of the injunctive order and prefers to await the further views of counsel in that regard; that is, counsel for the plaintiff may, in light of the factual findings herein, submit upon five days notice proposed findings of fact and conclusions of law and order for injunction and on the day of the hearing the Court will hear both parties as to the scope and terms of the injunctive relief which is to be granted herein.

An exception is reserved to the defendant.