COLEMAN MOTOR COMPANY, a Pennsylvania Corporation

v.

CHRYSLER CORPORATION and Chrysler Motor Corporation.

Civ. A. No. 68–819.

United States District Court,
W. D. Pennsylvania.

March 29, 1974.

Gerald Ziskind, Robert E. Wayman, Pittsburgh, Pa., for plaintiff.

Edmund K. Trent, Pittsburgh, Pa., for defendants.

## OPINION AND ORDER

SNYDER, District Judge.

This matter comes before the Court on Defendants' Motion for Judgment Notwithstanding the Verdict and Alternatively for a New Trial. For the reasons as hereinafter set forth both Motions will be denied.

## BACKGROUND.

Plaintiffs, Coleman Motor Company, a corporation, and Clarence Coleman, its President and sole stockholder, filed this anti-trust suit against Chrysler Corporation, the manufacturer of Chrysler, Plymouth and Dodge vehicles, and Chrysler Motor Corporation, its wholly owned sales subsidiary (which parties have been considered primarily as one entity and will be referred to as "Chrysler"), charging violations of Sections 1 and 2 of the Sherman Act. The individual Plaintiff was dropped as a party before the trial began. The Court denied Defendants' Motion for Directed Verdict at the close of all of the evidence and the case was submitted to the jury on Special Interrogatories asking:

(1) Whether Defendants had engaged in any combination or conspiracy which restrained trade in Dodge vehicles at the retail level in Allegheny County, Pennsylvania?

(2) Whether Defendants had attempted to monopolize trade in Dodge vehicles at the retail level in Allegheny County, Pennsylvania?

(3) Whether the Plaintiff had sustained any damages by reason of any such violation of the anti-trust laws, and if so, how much?

The jury answered the three questions in the affirmative and fixed the amount of the Plaintiff's damages at $300,000.-00. Judgment was entered for Coleman Motor Company for $900,000.00 on November 9, 1973, and the Defendants duly filed Motions for Judgment N.O.V. and for a New Trial.

A large part of the evidence offered at the trial was stipulated or uncontradicted, and the weight of the evidence strongly sustained the contention of the Plaintiff that there was an anti-trust violation arising out of destructive competition by other Dodge Dealerships in Allegheny County wholly or partially owned by the Defendants, which resulted in the necessity to surrender the Coleman franchise on July 17, 1969.

Coleman became a Dodge and Plymouth Dealer in 1955, with capitalization of $75,000.00 supplied by Mr. Coleman and another individual. In the Fall of 1959 (the beginning of the 1960 automobile model year) Coleman's Agreement, as well as the Agreements of most Dodge-Plymouth Dealers, was amended so that Coleman henceforth was solely a Dodge Dealer and others became Plymouth Dealers. To take the place of the smaller model Plymouths, Chrysler furnished a new model Dodge, the Dodge Dart, which had good public acceptance.

Prior to 1954, Chrysler had sold its automotive products to *privately* financed dealers for resale to the public. In 1954 Chrysler adopted a new plan for franchising known as the "Dealer Enterprise Plan" (hereinafter called D.E.) whereby it would furnish to one desiring to become a dealer, 75% of the money needed to open a dealership and the individual would supply 25%. This plan was developed in response to an imperative to increase the quantity of sales and, because individuals were finding it

more and more difficult to raise sufficient capital to become dealers. Under D.E. the individual would become the President and General Manager of the local corporation and a Member of its Board of Directors. This local person was to be entitled to an annual bonus of 25% of the corporation's profits before taxes, but was subject to the obligation to use one-half of the bonus in buying Chrysler's investment, represented by stock in the local corporation.

D.E. did not provide a complete solution to the problem because many individuals who desired to become Chrysler Dealers found difficulty in supplying even 25% of the capital necessary to open a dealership. Chrysler was experiencing declining sales and an inability to secure dealers. In 1958 it had sustained net losses of $34,000,000.00 and in 1959 they had losses of $5,000,000.00. Its share of the United States' automobile market dropped from 20% to 10%.

Thus, in 1961, Chrysler broadened its dealer franchising arrangements so as to supply initially 100% of the capital necessary to open a dealership, such dealerships being known as "Contractual Dealerships" (hereinafter called Contractual); this plan covered the situation until the Manager, either through profits or from other sources, purchased 25% of the stock and could thus come under D.E. In 1964, Chrysler further broadened the plan to lend the individual up to one-half of the money necessary to enable him to buy 25% of the stock to participate in D.E.

As a result of the success of the Contractual and D.E. Plans, the total number of Dodge Dealerships rose from 2559 at the end of 1961 to 3135 in 1972, of which 3004 were Private Capital Dealerships. While the number of new Private Capital Dodge Dealerships appointed each year varied between 101 and 525, the new Dodge Dealerships wholly or partially financed by Chrysler did not exceed 83. During the same period, that is from 1961 to 1972, Chrysler's share of the United States' automobile market rose from 10.8% to 14.4%,

and the Dodge sales increased from 3.9% to 5.7%. This is the general background for our analysis of the situation in the instant case.

## DISCUSSION.

■ In the subsequent discussion, we apply the well recognized rule of law that the verdict winner is entitled to the benefit of all evidence in its favor, regardless of who produced that evidence, and all favorable inferences deducible therefrom. United States v. Evers, 448 F.2d 863 (3rd Cir. 1971); Neville Chemical Company v. Union Carbide Corporation, 422 F.2d 1205 (3rd Cir. 1970), cert. denied 400 U.S. 876, 91 S.Ct. 51, 27 L.Ed.2d 55; Jarka Corp. v. Mitsui Zempaku K.K., 405 F.2d 763 (3rd Cir. 1967), cert. denied 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453; Walsh v. Miehle-Goss-Dexter Inc., 378 F.2d 409 (3rd Cir. 1967); Globe Motors, Inc. v. Studebaker-Packard Corporation, 328 F.2d 645 (3rd Cir. 1964); Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp., 325 F.2d 2 (3rd Cir. 1963).

## A. SHERMAN ACT—CONTRACT COMBINATION OR CONSPIRACY.

The first count of the Complaint dealt with the charge that Chrysler was in violation of Section 1 of the Sherman Act, which in relevant part reads as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, \* \* \* is declared to be illegal:" (15 U.S.C. A. § 1)

The Plaintiff's position is that Chrysler did not have the right to destroy Coleman's franchise through competition of its wholly or partially owned dealerships; Chrysler admits that between November of 1961 and April of 1962, three Contractual Dodge Dealerships were opened in Allegheny County, the relevant market. The first, Baum Boulevard Dodge, began business late in 1961, became a D.E. Dealer in 1965 but

reverted to Contractual status at the end of 1966. The second and third Contractual Dealerships, Hillside Dodge and Cloverleaf Dodge, became D.E. Dealerships in 1965. They subsequently went out of business in 1967 and 1968. A fourth Contractual Dodge Dealership, McKnight Road Dodge, was opened in 1970. In addition to the above Contractual Dealerships, three D.E. Dealerships were opened in Allegheny County: Southland Dodge in 1964, St. Clair Dodge in 1965, and Monroeville Dodge in 1966. The individual Manager of St. Clair Dodge completed the purchase of Chrysler's interest in 1971. The Managers of the other two D.E. Dealerships, Southland and Monroeville, had purchased part of Chrysler's interest as of the time of trial. A Table is set forth to show the relationship of Coleman's profits to the establishment of dealerships and to the total dealerships in Allegheny County.

## TABLE 1.*

| Year | Coleman Net P or L | Chrysler Financed Dealers Opened | Allegheny Cty Dealers | | | | Ally. Cty. New Car & Truck Mkt.Penetration | |
|------|------|------|------|------|------|------|------|------|
| | | | Total | Pvt. | D.E. | Con | Pvt. | Chrys.Fin. |
| 1961 | (15915) | Boulevard(C) | 16 | 15 | 0 | 1 | 98.8 | 1.2 |
| 1962 | (16779) | Hillside(C) Clover-leaf (C) | 16 | 13 | 0 | 3 | 61.0 | 39.0 |
| 1963 | 6360 | | 17 | 14 | 0 | 3 | 57.9 | 42.1 |
| 1964 | 2963 | Southland (D.E.) | 15 | 11 | 1 | 3 | 54.9 | 45.1 |
| 1965 | 3067 | St. Clair (D.E.) | 16 | 11 | 5 | 0 | 48.5 | 51.5 |
| 1966 | (4070) | Monroeville (D.E.) | 17 | 11 | 5 | 1 | 47.8 | 52.2 |
| 1967 | (12126) | | 16 | 11 | 4 | 1 | 45.8 | 54.2 |
| 1968 | (4566) | | 15 | 11 | 3 | 1 | 48.1 | 51.9 |

At the end of 1960 there were fifteen Dodge Dealers in Allegheny County, all privately financed. Between then and the end of 1972, the number fluctuated between seventeen and thirteen, of which six were wholly or partially owned by Chrysler. At the end of 1972, there were nine Private Capital Dealers, two D.E. Dealerships (Southland and Monroeville) and two Contractual Deal-

* Pvt.–Private Capital
D.S.–Dealer Enterprise
Con–Contractual–(C)

erships (Baum Boulevard and McKnight Road). From 1961 to 1968, five new Private Capital Dealerships had opened, four in replacement of other Private Capital Dealerships and one in a new location. Between 1962 and 1972, Chrysler's share of the total automobile market in Allegheny County rose from 11% to 18% and Dodge sales increased from 5% to 8%.

As to Coleman (see foregoing Table 1), it was a privately financed dealership which had no net profit in any year after it became a Dodge Dealership in 1955, except 1960 when it made $13,351. This was followed by a loss in 1961 of $15,915. The three Contractual Dealerships were opened in Allegheny County between November of 1961 and April of 1962 and three D.E. Dealerships were opened, in 1964, 1965 and 1966. From the opening of the Contractual Dealer-ships until Coleman ceased operation in 1969, it suffered a loss of $16,779.00 in 1962, had small profits in the next three years, and began to lose heavily thereafter. The Plaintiff attributed its lack of success after 1961, and its ultimate closing in 1969, to the competition of the Contractual and D.E. Dealerships in Allegheny County during those seven and a half years.

Private Capital Dealers had 98.8% of the Dodge Market in Allegheny County in 1961 and this dropped to 57.9% in 1963 and to 48.1% in 1968, showing the penetration of the Dodge Market by the Chrysler financed dealers. (See Table 1.)

At the same time, Chrysler and Dodge sales, as a percentage of the total Allegheny County new car sales, showed the following upward trend:

TABLE 2.

NEW PASSENGER AUTOMOBILE REGISTRATIONS

| Year | Gen. Motors | Ford | Total Chrysler | Only Dodge | A.M.C. | Other |
|------|-------------|-------|----------------|------------|--------|-------|
| 1962 | 53.01 | 23.39 | 11.28 | 4.94 | 6.71 | 5.61 |
| 1963 | 51.42 | 22.07 | 13.96 | 6.47 | 6.84 | 5.71 |
| 1964 | 49.49 | 24.22 | 14.25 | 6.63 | 5.88 | 6.16 |
| 1965 | 51.86 | 22.15 | 15.26 | 6.56 | 4.32 | 6.41 |
| 1966 | 49.01 | 24.01 | 16.52 | 7.28 | 3.45 | 7.01 |
| 1967 | 50.50 | 20.73 | 17.60 | 7.51 | 2.87 | 8.30 |
| 1968 | 47.56 | 21.37 | 18.01 | 7.19 | 2.98 | 10.08 |

It is necessary now to look at the form of the contract, combination or conspiracy alleged here to be in restraint of trade or commerce and alleged to be illegal under Section 1 of the Sherman Act. Chrysler, in an unquestioned effort to achieve a greater penetration of the motor vehicle market in Allegheny County, chose to use its Contractual and D.E. Financed Dealers in such a manner as to achieve a maximum penetration of the market by engaging in various practices which amounted to subsidization of financed dealerships

with the result that Private Capital Dealers were put at a substantial economic disadvantage.

■ We shall briefly discuss three of these practices and the effect on the market as a whole. This becomes important because of the well recognized doctrine that there may be a conspiracy to restrain trade in the retail sale of a vehicle manufactured by a single manufacturer in violation of Section 1 of the Sherman Act. United States v. General Motors Corporation, 121 F.2d 376, 402–403 (7th Cir. 1941) (where G.M. was convicted of a Section 1 conspiracy for requiring its independent automobile dealers to use G.M.A.C. financing exclusively); the "movie cases", Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160 (1944); (where the movie exhibitors owned wide spread chains of theatres); United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); (restraints on the sale of motor vehicles to the principal cab operating companies, that is, the vertical integration among those affiliated under common ownership as against those who are otherwise independent); United States v. New York Great A & P Tea Co., 173 F.2d 79 (7th Cir. 1949) (where A & P used the power of its integrated empire to restrain trade and to monopolize by coercion and by predatory practices). Thus, in Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), Kiefer-Stewart was a wholesale drug concern and it was charged that the defendant corporations had agreed and conspired to sell liquor only to those wholesalers who would resell at prices fixed by the defendants. Defendant corporations were Seagram of Indiana (100% subsidiary of Distillers Corporation of Canada), Seagram Sales and Calvert (100% subsidiaries of Seagram of Indiana); and Calvert Sales (100% subsidiary of Calvert). The Supreme Court found that the parent and the two 100% subsidiaries of the same parentage unlawfully conspired together. The Court answered the defendants' contention that "as mere instrumentalities of a single manufacturing-merchandising unit" it would not be possible to have conspired in a manner forbidden by the Sherman Act, and held: "but this suggestion runs counter to our past decisions that common ownership and control does not liberate corporations from the impact of the anti-trust laws."

In Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), an action was brought charging the defendant with violation of Section 1 of the Sherman Act by combining and conspiring with British Timken and French Timken with an agreement to divide territory and fix prices for anti-friction bearings. American Timken owned 30% of British Timken stock. British and American Timken, in turn, each owned 50% of French Timken. The argument was made that restraints of trade could be justified as "reasonable" and, therefore, not in violation of the Sherman Act because they were part of a "joint venture". The Court states as follows (at pp. 597–598, 71 S.Ct. at p. 974):

"We cannot accept the 'joint venture' contention. That the trade restraints were merely incidental to an otherwise legitimate 'joint venture' is, to say the least, doubtful. The District Court found that the dominant purpose of the restrictive agreements into which the appellant British Timken and French Timken entered was to avoid all competition either among themselves or with others. Regardless of this, however, appellant's argument must be rejected. Our prior decisions plainly established that agreements providing for an aggregation of trade restraints such as those existing in this case are illegal under the Act. * * * The fact that there is common ownership or control of the contracting corporations does not liberate

them from the impact of the antitrust laws. \* \* \* Nor, do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labelling the project a 'joint venture.' Perhaps every agreement and combination to restrain trade could be so labeled."

■ Thus, we find that the holdings of the Supreme Court are that related companies may be found in violation of Section 1 of the Sherman Act if there are contractual arrangements, combinations or conspiracies and the objectives or reasons for such arrangements, combinations or conspiracies are deemed illegal either per se, or are found to be an unreasonable restraint based upon the proof of their effect and intent.

■ The Defendants argue very strongly and with obvious merit, that the Defendants' conduct must be shown not only to have harmed the Plaintiff but that such conduct violates the Sherman Act. It is true that the Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce but only those which, as we have said, constitute an unreasonable restraint of trade based upon the proof of the effects or the intent, or both. Hunt v. Crumboch, 325 U.S. 821 at 826, 65 S.Ct. 1545 at 1548, 89 L.Ed. 1954 (1945). It is interesting to note that the Plaintiff here does not dispute the Defendants' contention "that the Defendants had a right to determine the number and location of dealerships they would authorize to sell Dodge automobiles in Allegheny County, to open new dealerships even of whatever size and whatever location they desired, to close existing dealerships, including the Plaintiff, and to terminate according to their terms and agreements." The Defendants then dispute the contention of the Plaintiff that the Act does bar such conduct when it involves a conspiracy to create or a tendency to monopolize or re-

strain trade. It is a question of whether or not the Defendants' conduct viewed as a whole was a result of predatory intent with the tendency to monopolize or restrain trade, to the damage of the Plaintiff.

This Court starts with the statement made by Judge Knox of this Court in Rea v. Ford Motor Company, 355 F. Supp. 842 (W.D.Pa.1973), as follows (at p. 867):

"Whether dual distribution is or is not illegal or evil in and of itself, it does become an antitrust problem in the context of its use by a company possessing substantial market power. \* \* \* \* The evidence here shows that Ford Motor Company, the defendant, is the only source of Ford and Lincoln-Mercury automobiles, trucks and other automotive products. An independent Ford Dealer has a large investment in money and good will tied up in Ford vehicles and facilities for them. Under the terms of the sales agreement, he must use his best efforts to achieve the full extent of Ford market penetration reasonably anticipated in his area. He cannot turn to another manufacturer for vehicles. If he is shut off, he strangles to death in a short time. Thus, if Ford for its own purpose chooses to use its company stores and dealer development agencies for the purpose of maximizing its profits through large subsidies to these company-owned facilities with the result that private dealers are put at a substantial economic disadvantage, it is the court's opinion that a cause of action is made out under Sherman I. . . . ."

In this case, there is no question that Chrysler possessed a substantial market power. Between 1962 and 1968, as indicated previously, Chrysler's share of the total automobile market in Allegheny County rose from 11.28% to 18.01%. Chrysler, for its own purposes and to maximize the market penetration, as will be shown later, chose to give large subsidies to company-owned facilities and the private dealer suffered a substantial

economic disadvantage. As Judge Knox said, it is this type of substantial economic disadvantage which is a violation of the anti-trust laws when seen as a result of a scheme, design or purpose for market penetration and monopoly power. We are not dealing here with the situation disclosed in Brown Shoe Co. v. United States, 370 U.S. 294, 344, 82 S. Ct. 1502, 8 L.Ed.2d 510 (1962) where the Court was concerned about the results of large integrated or chain operations which were primarily beneficial to consumers. The Court held that their expansion was not rendered unlawful by the mere fact that small independent stores may be adversely affected. It is competition "not competitors, which the Act protects." But *Brown Shoe* does not attempt to countenance the removal of retail outlets by the use of predatory practices which can only result in an adverse effect on the consumer in the long range view of the monopolistic problem.

Thus in Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D. Pa.1968), affirmed 417 F.2d 622 (3d Cir. 1969), Judge Dumbauld of this Court held that there could be a conspiracy or attempt to monopolize the market for new Dodge vehicles in Allegheny County, Pennsylvania. As the Defendants say, the establishment of a place to sell automobiles might well seem to be the best way to promote trade in automobiles and especially in automobiles of the type to be sold there—Dodge automobiles. But the failure of the Defendants is to realize the inevitable effect upon the local relevant market as effected through interstate mechanisms or opportunities. Lorain Journal v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L. Ed. 162 (1951); Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951); United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

Thus, for example, in Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954), where an interstate operator cut prices in a single town so as to drive a local competitor out of business, it was held that the same fell within the anti-trust prohibition. The Court stated (at pp. 119–120, 75 S.Ct. at p. 150):

"If this method of competition were approved, the pattern for growth of monopoly would be simple. As long as the price warfare was strictly intrastate, interstate business could grow and expand with impunity at the expense of local merchants. The competitive advantage would then be with the interstate combines, not by reason of their skills or efficiency but because of their strength and ability to wage price wars. The profits made in interstate activities would underwrite the losses of local price-cutting campaigns. No instrumentality of interstate commerce would be used to destroy the local merchant and expand the domain of the combine. But the opportunities afforded by interstate commerce would be employed to injure local trade. Congress, as guardian of the Commerce Clause, certainly has power to say that those advantages shall not attach to the privilege of doing an interstate business."

The Defendant argues that since the manufacturer may lawfully set up an exclusive dealership in a certain territory, a manufacturer does not restrain trade by terminating one or more of its dealers handling the distribution of its own product in competition with like products of other manufacturers. It is certainly true that a manufacturer's contract to sell only to certain dealers or distributors, while restraining trade, is permissible under the rule of reason of the Standard Oil of N. J. v. United States case, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Also, a manufacturer may set up an exclusive dealer in a certain territory or terminate one dealer and substitute another and, although trade of the existing dealer would thereby be restrained, it would not be a violation of the anti-trust laws. Schwing Motor Company v. Hudson Sales Corporation, 138 F.Supp. 899 (D.C.Md.1956), affirmed 239 F.2d 176 (4th Cir. 1956),

cert. denied 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957); and Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418 (1957) cert. denied 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38, petition for rehearing denied 355 U.S. 900, 78 S.Ct. 259, 2 L.Ed. 2d 197. Thus in *Schwing*, Hudson terminated Schwing's franchise and appointed another as an exclusive dealer in Baltimore. The Court granted the defendant's motion to dismiss Schwing's complaint charging a violation of both Sections 1 and 2 of the Sherman Act, and stated as follows (at p. 903 of 138 F.Supp.):

> "The main purpose of the anti-trust laws is to protect the public from monopolies and restraints of trade, and the individual right of action for treble damages is incidental and subordinate to that main purpose. * * * * Public injury alone justifies the threefold increase in damages. It is essential, therefore, that the complaint allege facts from which it can be determined that the conduct charged to be in violation of the anti-trust laws was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce."

In that case, the public was not injured by the alleged fact that 357 Hudson automobiles failed to move in interstate commerce, since the market and the general commodity, automobiles in all price ranges, remained in normal competitive state. In United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Court held illegal the manufacturer's imposition of a limitation on territory in which they could resell the bicycles purchased only on the basis that the manufacturer freed limited sales to certain dealers. But this is not the same as saying that a restraint which did not stop at a mere vertical confinement of the manufacturer's sales but instead went on to reduce the competition would not be a violation of the Sherman Act.

In Ark Dental Supply Company v. Cavitron Corporation, 461 F.2d 1093 (3rd Cir. 1972), the Court followed Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), cert. denied 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) and held that a single manufacturer-seller could ordinarily stop doing business with A and transfer his business to B, and such a transfer is valid even though B may have solicited the transfer, and even though the seller and B may have agreed prior to the seller's termination of A.

■ While Chrysler may have an absolute right to terminate Coleman's Dealership, and not having done so, it then becomes a question of whether or not Coleman can be driven out of business by an obvious predatory intent to maximize profits at the manufacturing level by minimizing losses at the retail level. The Defendant argues that the entire purpose of the anti-trust laws is to prevent harm to the public and consequently that the public, under the evidence in this case, could not be harmed any more when an automobile manufacturer terminates one of its independent dealerships, even though the public thereby loses one source of supply for automobiles, than if the same dealer is put out of business by the manufacturer's competition. This fails to take into account the whole doctrine of the *Rea* and *Mt. Lebanon* cases that when a company possesses substantial market power, as is clearly indicated Chrysler Corporation does, then a result that private dealers are put at substantial economic disadvantage is exactly the type of result which is proscribed by the anti-trust laws.

From the evidence, the jury could well have found the following practices to have been carried out by Chrysler:

1. Chrysler Financed Dealers were permitted to expend two to three times the amounts which Private Capital Dealers were justified in spending for advertising, and the amount of these excess

advertising costs were treated as part of the operating losses for the year. A comparison of these losses is set forth below as Table 3.

## TABLE 3.

### CAPITAL LOSSES FOR ADVERTISING

COMPARISON
FINANCED DEALERS LISTED (LOSSES REPAID) AND COLEMAN (NOT REPAID)

| Dealers | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|---|---|---|
| Coleman | 12,233 | 15,889 | 14,864 | 14,258 | 21,454 | 16,707 | 20,540 |
| Boulevard | 97,460 | 87,965 | 83,984 | 100,071 | 75,844 | 67,892 | 68,342 |
| Hillside | | 18,012 | 6,954 | 8,521 | 13,662 | 13,690 | |
| Cloverleaf | | 28,774 | 24,672 | 20,162 | 31,956 | | |
| Southland | | | | 22,440 | 17,030 | 26,435 | 33,105 |
| St. Clair | | | | 26,729 | 21,343 | 24,115 | 32,287 |
| Monroeville | | | | | | 29,169 | 20,652 |

2. Chrysler Financed Dealers were permitted to pay excessive rent which the Private Capital Dealers could not justify, again the rent was treated as part of the operating loss for the year. A comparison of the amounts spent for rent by the Financed Dealers and Coleman Motors is set forth as Table 4.

## TABLE 4.

### COMPARISON - OVERHEAD (RENT) EXPENSES
### FOR COLEMAN AND THE FINANCED DEALERS

| Dealers | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|---|---|---|
| Coleman | 99,940 | 91,749 | 105,806 | 111,425 | 120,717 | 114,621 | 122,297 |
| Boulevard | 264812 | 283,719 | 303,149 | 338,363 | 360,402 | 404,285 | 404,739 |
| Hillside | | 100,019 | 89,358 | 108,058 | 108,942 | 111,177 | |
| Cloverleaf | | 136,589 | 133,843 | 169,746 | 181,425 | | |
| Southland | | | | 127,703 | 145,961 | 158,498 | 175,870 |
| St.Clair | | | | 129,900 | 162,738 | 189,831 | 226,029 |
| Monroeville | | | | | | 156,768 | 194,157 |

3. Chrysler Financed Dealers were permitted to retain large staffs on the payroll which the Private Capital Dealers could not justify, these costs being taken as part of the operating losses for the year. The losses incurred by the Financed Dealers were added to the manufacturing expense by way of replacement of the losses with factory money. A comparison of these amounts is set forth as Table 5.

TABLE 5.

COMPARISON - STAFF COSTS
FINANCED DEALERS LISTED (LOSSES REPAID) AND COLEMAN (NOT REPAID)

| Dealers | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|---|---|---|
| Coleman | (16779) | 6360 | 2963 | 3067 | (4070) | (12126) | (4566) |
| Boulevard | (51887) | (53291) | 3495 | 4865 | (37519) | (37840) | 23505 |
| Hillside | | (48406) | 10647 | (28690) | 2188 | (2522) | |
| Cloverleaf | | (86883) | 75975 | 46792 | (49327) | | |
| Southland | | . | | (5424) | (682) | 16388 | 27797 |
| St.Clair | | | | (20687) | 51895 | 39482 | 38124 |
| Monroeville | | | | | | (47807) | (34855) |

The effect of the subsidization of these Dealers on Coleman Motors was predictable. Thus, Coleman's percentage of Dodge Sales in Allegheny County shows the following regression while Chrysler Financed Dealers increased penetration:

TABLE 6.

COMPARISON - PERCENTAGES OF AUTOMOBILE AND TRUCK SALES - ALLY. CTY.

| Dealer | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|---|---|---|---|
| Coleman | 14.2% | 7.4% | 5.8% | 6.0% | 5.2% | 5.6% | 5.07% | 3.8% |
| Financed Dealers | 1.2% | 39.0% | 42.1% | 45.1 | 51.5% | 52.5% | 54.2% | 51.9% |

The minimum sales responsibility attainment (as projected for Coleman by Chrysler) showed the following picture of decline for Coleman as compared to increase for Boulevard Dodge:

## TABLE 7.

### COMPARISON - MINIMUM SALES RESPONSIBILITY (MSR)

|                        | 1961  | 1962  | 1963  | 1964  | 1965 | 1966 | 1967  | 1968  |
|------------------------|-------|-------|-------|-------|------|------|-------|-------|
| Coleman Units sold     | 222   | 209   | 304   | 295   | 277  | 300  | 208   | 209   |
| Coleman % of MSR       | 160.9 | 87.8  | 104.1 | 84.5  | 69.9 | 74.6 | 71.5  | 60.8  |
| Boulevard % of MSR     |       | 205.7 | 179.6 | 130.9 | 96   | 88.9 | 128.8 | 106.2 |

Looking at the entire picture, it is the opinion of the Court that the verdict of the jury in finding that these practices constituted a violation of Section 1 of the Sherman Act was justified and that neither a judgment notwithstanding the verdict nor a new trial should be granted as to the Sherman 1 violations.

The Defendants make the following interesting observation in their Brief filed in support of their Motions (p. 18):

"At the trial plaintiff's principal contention was that it could not meet the prices of its two principal competitors, Boulevard Dodge and Monroeville Dodge, and that defendants subsidized their net losses by capital replenishments, thereby enabling them to continue in competition with plaintiff. This does not, however, show any illegality on the part of the defendants.

Plaintiff could not have been injured by net losses sustained by Boulevard Dodge and Monroeville Dodge. It would depend on the cause of the losses. If they were caused by excessive overhead costs, such as high rent, or because the president drank expensive champagne for lunch every day, that would not have hurt plaintiff. If, however, the losses of plaintiff's competitors arose from selling automobiles below cost, or at a substantially insufficient mark up, then plaintiff's business could have suffered."

However, there is no substantial difference in effect, insofar as Coleman is concerned, whether excessive advertising costs are paid by Chrysler factory money or if the cars are reduced in price by the amount of the excessive advertising costs. It is this type of evidence which shows that predatory competition was proven.

Defendant also contends that the record is devoid of evidence that Dodge sales of Boulevard Dodge and Monroeville Dodge were at unreasonably low prices so as to indicate predatory competition. But this, as we have seen before, begs the question as to whether or not there was in fact a predatory practice being carried on by the subsidizing of excessive costs. It was not, as the Defendant contended, that the Plaintiff's prime complaint was that it was unable to remain in business because the competition of Boulevard and Monroeville Dodge, but rather that the practice of Boulevard and Monroeville Dodge, as carried on by conspiracy and agreement with Chrysler Corporation, amounted to a predatory practice in violation of the anti-trust laws. We find the contention

of the Plaintiff Coleman to be correct and the Defendants' practices to amount to a violation of Section 1 of the Sherman Act.

### B. SHERMAN ATTEMPT TO MONOPOLIZE INTERSTATE COMMERCE.

Section 2 of the Sherman Act reads as follows:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be deemed" [to be a violator of the statute].

The Plaintiff confined its charge of violation of Section 2 of the Sherman Act to Dodge automobiles in Allegheny County. The jury found that the Defendants during the statutory period preceding the Plaintiff's withdrawal from business attempted to monopolize interstate commerce in Dodge vehicles at the retail level in Allegheny County.

■ To be guilty of monopolizing under Section 2 of the Sherman Act, there must be the power of controlling prices or unreasonably restricting competition in some product, often referred to as "the line of commerce" or "the relevant market." United States v. E. I. DuPont DeNemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Nelligan v. Ford Motor Company, 161 F.Supp. 738 (W.D.S.C.1958), affirmed 262 F.2d 556 (4th Cir. 1959); Arthur v. Kraft-Phenix Cheese Corporation, 26 F.Supp. 824 (D.C.Md.1938). In order to violate the Statute, it is not necessary that there be shown an actual achievement of a monopolization. It is sufficient if there is shown an attempt to monopolize. In Lorain Journal v. United States, *supra,* an action was brought for injunction under Section 2 of the Sherman Act. The situation involved a publisher who had enjoyed a substantial monopoly of the mass dissemination of news and advertising in Lorain, Ohio, from 1933 to 1948. The newspaper was the only one in the city and its daily circulation reached 90% of the city's families. In 1948, a radio station, WEOL, was licensed to operate and entered into competition for the city's advertising business from which the station derived substantially all of its income. The publisher then adopted a plan whereby he refused to accept advertising in his newspaper from any local advertiser who did any advertising over the radio. The publisher forced numerous merchants to cease using the radio station for local advertising. The Court held that the publisher's contract was an attempt to monopolize interstate commerce in that it was an attempt to regain a monopoly position and this violated Section 2 of the Sherman Act.

In Mt. Lebanon Motors, Inc. v. Chrysler Corporation, *supra,* Judge Dumbauld held that Chrysler could conspire or attempt to monopolize the market for new Dodge vehicles in Allegheny County, Pennsylvania, although it could not monopolize the retail sale of automobiles and stated as follows (at pp. 460–462 of 283 F.Supp.):

"Turning to the charges under Section 2 of the Sherman Act, it must be noted that that section specifies not one but three offenses. The section provides 'Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor' (15 U.S.C. § 2). Monopolization, attempt to monopolize, and conspiracy to monopolize are separate offenses.

Monopolizing is judicially defined as acquiring or maintaining dominant market control, with the power to raise or fix prices at a non-competitive level or to exclude or eliminate

competitors from the market. American Tobacco Co. v. United States, 328 U.S. 781, 809–815, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Griffith, 334 U.S. 100, 105–107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

There is considerable discussion in the cases regarding the 'relevant market' in situations involving Section 2. To begin with the section itself speaks of monopolizing 'any part of the trade or commerce among the several States, or with foreign nations.' It has long been held that 'The commerce referred to by the word 'any part,' construed in the light of the manifest purpose of the statute, has both a geographical and a distributive significance; that is, it includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce.' Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). Thus trade in a particular geographical area or in a particular article of commerce is sufficiently identifiable as a 'part' capable of being restrained or monopolized.

Thus commerce in Dodge automobiles at the retail level in Allegheny County is a sufficiently identifiable 'part' of interstate commerce to be susceptible of restraint or monopolization. United States v. Klearflax Linen Looms, 63 F.Supp. 32, 39 (D.Minn. 1945). The Klearflax case illustrates the distinction between the natural and inevitable monopoly of any manufacturer over its own goods at the manufacturing level and the monopolizing of the business of retail selling of such goods on the retail level. The case also indicates that an unlawful restraint may exist with respect to a particular type of product, indeed the product produced by a single manufacturer.

United States v. General Motors Corporation, 121 F.2d 376, 400 (C.A. 7, 1941) contains another clear eluci-

dation of the distinction between the trade and commerce of the manufacturer at the manufacturing level and that of the dealers in General Motors automobiles at the retail level, and holds that the latter is susceptible of illegal restraint by the manufacturer.

\*　　\*　　\*　　\*　　\*　　\*

The essence of monopoly being power to control prices and exclude competition, Lessig v. Tidewater Oil Co., 327 F.2d 459, 474 (C.A. 9, 1964), there may exist situations in which such power cannot be effectively established if fungible substitute products are available in the market. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 392–395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). This would seem to be the situation in the case at bar.

Product differentiation through advertising, styling, and other features is common in the automobile industry. There has been testimony in the case indicating that much of the business of a dealership consists in selling new cars of the same make to loyal customers. It is common knowledge, however, that there is a limit to the brand loyalty of automobile purchasers.

\*　　\*　　\*　　\*　　\*　　\*

Thus it seems clear that no effective price control by Chrysler or exclusion of competition, amounting to monopolization, could be effective in the Allegheny County market in face of the competition of General Motors, Ford, and other manufacturers. The brand loyalty of Dodge owners would undoubtedly dissipate in the face of price increases to a monopolistic level. No successful monopolizing of the Allegheny County Market for Dodges could be achieved without collusive or coercive arrangements to render ineffective the competition of other makes, and no evidence of any such arrangements is in the record in the case at bar. We therefore must grant

the motion for directed verdict with respect to the charge of monopolizing, under Section 2.

With respect to the second offense under Section 2, attempt to monopolize, the situation is different. Here 'The acts of attempted monopolization condemned by § 2 of the Sherman Act are those performed with the specific intent to unlawfully monopolize, but falling short of the goal.' United States v. Charles Pfizer & Co., 245 F. Supp. 737, 739 (E.D.N.Y.1965). As there said: 'The gravamen of attempt is the specific intent to commit an illegal act, but falling short of completion.'

'Because the antitrust laws strike equally at nascent and accomplished restraints of trade, monopolistic designs as well as results are reached by the prohibitions of the Sherman Act.' Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 622–623, 73 S.Ct. 872, 888, 97 L.Ed. 1277 (1953).

An attempt is, as the term indicates, a conative effort to achieve a result. The mere failure to succeed, or the impossibility of success, does not negative an attempt. When the Memorial Day races are held in Indianapolis, there is only one victor, but all the entrants attempt to win.

The mental or volitional element is significant in the case of an attempt. Specific intent is a necessary ingredient of an attempt when the acts performed fall short of the results condemned by the Act. United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); Lorain Journal Co. v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Cf. the comments of Judge Learned Hand in United States v.

Aluminum Co. of America, 148 F.2d 416, 431–432 (C.C.A.2, 1945).

Likewise with respect to the third offense under Section 2 of the Sherman Act, conspiracy to monopolize, intent, as evinced in concerted action, rather than possibility of success, is the crucial factor. For this offense the existence of a conspiracy is essential; whereas the cognate offenses of monopolizing or attempting to monopolize can be performed unilaterally by a single party. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 709, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).''

The real issue here then is whether or not there is support for the Plaintiff's sub-market theory. Coleman contends that Chrysler is the only source of Dodge automobiles, trucks and automotive products and because a Dodge Dealer, under the standard dealer terms and conditions, must fulfill his fair share of the sales objective (that is, must achieve the full extent of Dodge market penetration reasonably anticipated in its sales area—called "MSR"), he cannot afford to turn to another manufacturer for vehicles as there is a large investment in money and good will tied up in Dodge Models of vehicles in his sales area.

Sub-markets of a larger definable market are found where the economics are such that the substitution of the service in another sub-market would be unprofitable and hence not reasonably interchangeable. In defining relevant markets and sub-markets, the standard employed under Clayton-Section 7 cases, "line of commerce" may be used to define markets under Sherman Act 2. United States v. Grinell Corp., 384 U.S. 563, 572–573, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1968). Thus, in the *"Florist Foil"* case (Reynolds Metals Company v. F. T. C., 114 U.S.App.D.C. 2, 309 F.2d 223 (1962)), a Clayton-Section case, the Court relied on Brown Shoe Co. v. United States, *supra,* and recognized Florist Foil as a separate market of aluminum

foil in the light metal industry, and public recognition of that product as distinguishable. Here, Chrysler has a monopoly power in the wholesale market for Dodge automobiles and the use of that power to monopolize, or to conspire, or to attempt to monopolize the sub-market violates Section 2 of the Sherman Act. United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 346 (D.C.Mass. 1952); United States v. Pullman Co., 50 F.Supp. 123, 133 (E.D.Pa.1943).

■■■■ Separate localities may be monopolized under Section 2 of the Sherman Act and constitute the geographic market in which to measure the Defendants' economic power. United State v. Pullman Co., supra; United States v. United Shoe Machinery Corp., supra. Where by nature of the business involved, it is uneconomical to operate on a national scale (though the defendants may operate in many locations throughout the nation), a local geographical area will serve as the relevant market. Case-Swayne v. Sunkist Growers, Inc., 369 F.2d 449 (9th Cir. 1966), reversed on other grounds 389 U.S. 334, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967); United States v. Griffith, supra.

■■■■ The two prerequisites for showing an attempt to monopolize are (1) an intent on the part of the defendant, often referred to as "specific intent," that is, "an intent to bring about the forbidden act." United States v. Aluminum Co. of America, 148 F.2d 416, 431–432 (2nd Cir. 1945), and (2) the defendants committed some act in furtherance of that intent, even though insufficient to produce monopoly.

Here again the Court in Mt. Lebanon Motors, Inc. v. Chrysler Corp., supra, as quoted previously, discussed an attempt and conspiracy to monopolize as distinguished from monopolizing. We do not feel it essential to get into the question of whether or not in attempts to monopolize, the evidence must show a dangerous probability of success. This Court did not charge on the matter nor was any exception taken with respect to any such failure on the part of the Court. This would be required if the Defendant was going to claim error as a result of such omission. See Morley v. Branca, 456 F.2d 1252 (3rd Cir. 1972); Rea v. Ford Motor Co., supra; F.R.Civ. P., No. 51.

■■■■ We further hold that the relevant market is not in issue in an attempt and conspiracy to monopolize case, Lessig v. Tidewater Oil Company, 327 F.2d 459 (9th Cir. 1964), cert. denied 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046. Lessig relied on United States v. E. I. DuPont DeNemours & Co., supra; Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 667 (9th Cir. 1963); Union Carbide and Carbon Corporation v. Nisley, 300 F.2d 561, 585 (10th Cir. 1961). Cf. Agrashell, Inc. v. Hammons Products Company, 479 F.2d 269 (8th Cir. 1973); Cornwell Quality Tools Co. v. C. T. S. Company, 446 F.2d 825, 832 (9th Cir. 1971); See particularly, Dobbins v. Kawasaki Motors Corporation, U. S. A., 362 F.Supp. 54 (D.C.Or.1973).

There are several other contentions made by the Defendants which must be disposed of by the Court. We find all of these contentions to be without merit, but they do require some discussion.

■■■■ The first of these contentions is that there was no competent evidence that Plaintiff was injured by reason of the acts of the Defendants or of anything forbidden in the anti-trust laws. There was considerable evidence presented to the jury that the operation of the Chrysler Financed Dealers adversely affected the profitability of the Plaintiff's business and ultimately forced the Plaintiff out of business. The primary proof in this regard was the fact that Coleman Motors was located approximately half way between two Chrysler Financed Dealers, Boulevard Dodge and Monroeville Dodge, and in the testimony of Dr. Schlesinger, one of Plaintiff's expert witnesses, he dealt with the direct eco-

nomic effect the acts of the Defendants had upon the Plaintiff's operation. There was also the very damaging evidence that when Plaintiff went out of business, the gross profits on each car sold by Boulevard Dodge or Monroeville Dodge were most substantially increased. An important part of the evidence related to losses being sustained by the Financed Dealers and the fact that such losses were being absorbed at the factory level. It was Dr. Schlesinger's opinion that not only this operation seriously impair any attempt by a Private Capital Dealer to carry on a profitable business but made it impossible for a Private Capital Dealer to operate. There was a clear question of fact presented to the jury and the jury ruled against the Defendants' contention.

The Defendants also contend (1) that the verdict was excessive, and (2) could only have been reached by a jury subject to influence or bias, passion or prejudice. These two contentions are closely related and will, therefore, be discussed together. The Supreme Court of the United States has *clearly* established the guidelines which are applicable to a situation of this kind in Zenith Radio Corporation v. Hazeltine Research, 395 U.S. 100, at pp. 123–124, 89 S.Ct. 1562, at pp. 1576–1577, 23 L.Ed.2d 129 (1969) as follows:

"Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiff's business, and from the evidence

of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.' Bigelow v. RKO Pictures, Inc., *supra*, 327 U.S. 251 at 264, 66 S. Ct. 574, at 579, 90 L.Ed. 652 at 660. See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 377–379, 47 S.Ct. 400, 404–405, 71 L. Ed. 684, 690, 691 (1927); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561–566, 51 S. Ct. 248, 250–251, 75 L.Ed. 544, 547–550 (1931).

In Bigelow, a treble-damage plaintiff claimed injury from a conspiracy among film distributors to deny him first-run pictures. He offered evidence comparing his profits with those of a competing theater granted first-run showings and also measuring his current profits against those earned when first-run films had been available to him. This Court, reversing the Court of Appeals, found the evidence sufficient to sustain an award of damages. Although the factfinder is not entitled to base a judgment on speculation or guesswork, 'the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances, "juries are allowed to act upon probable and inferential, as well as direct and positive proof." Story Parchment Co. v. Paterson Co., *supra*, 561–564, 51 S.Ct. 250, 251 [75 L.Ed. 547–549]; Eastman Kodak Co. v. Southern Photo Co., *supra*, 273 U.S. 377–379, 47 S.Ct. 404, 405 [71 L.Ed. 690, 691]. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a re-

covery.' 327 U.S., at 264–265, 66 S. Ct. at 580, 90 L.Ed. at 660.''

In the instant case, through the testimony of the Plaintiff and that of its experts, it established that it had been injured in its business and property by reason of the acts of the Defendants which were in violation of the anti-trust laws. See Hobart Brothers Co. v. Malcolm T. Gilliland, Inc., 471 F.2d 894 (5th Cir. 1973); Ford Motor Company v. Webster's Auto Sales, Inc., 361 F.2d 874 (1st Cir. 1966); Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012 (9th Cir. 1965), cert. denied 382 U.S. 958, 86 S.Ct. 433, 15 L. Ed.2d 362.

■ Once causation in an anti-trust action has been established, the jury is then permitted to make ''a just and reasonable estimate of the damage based on relevant data'', Bigelow v. R.K.O. Radio Pictures, Inc., 327 U.S. 251, 264, 66 S. Ct. 574, 580, 90 L.Ed. 652 (1946) and, of course, damages do not depend on the precise proof, Locklin v. Day-Glo Color Corporation, 429 F.2d 873, 879 (7th Cir. 1970), cert. denied 400 U.S. 1020, 91 S. Ct. 584, 27 L.Ed.2d 632, and can even be based on assumptions, if the assumptions rest on an adequate basis, Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906 (2nd Cir. 1962), cert. denied 369 U.S. 865, 82 S.Ct. 1031, 8 L. Ed.2d 85.

■ The evidence here showed that the Plaintiff was grossing in excess of a million dollars per annum—with fixed expenses such that even the slightest margin of increased sales would have tipped the scales to profit. It was not unreasonable for the jury to conclude that there was a loss to the Plaintiff in the amount of at least twenty-five thousand dollars per annum (this would mean a total loss of one hundred thousand dollars in profits during the four year period prior to the trial), and that the business as a successfully operating unit commanded a value of two hundred thousand dollars—based upon a projection of profit of twenty thousand dollars per annum, the business under a ten year capitalization concept would have been worth two hundred thousand dollars.

The Plaintiff's expert witness, Dr. Albert Kuehn, under the most grueling cross-examination, rendered three projections which the jury could find were based upon sound and logical reasoning. He took as his base the actual sales of Dodge automobiles in Allegheny County from 1955 to 1972 and established a trend line calculated on a statistical regression method, known as ''Least Squares'', and computed Coleman's projected share of the Allegheny County ''experience'' Dodge Market. From the share of the market which Coleman had attained in 1960 and 1961, during which years he had sold 8.26% of all Dodges sold in Allegheny County, and from Doctor Kuehn's projection, certain calculations were made. A projection of 7% was used as a pessimistic calculation (Projection A) of a lesser market share than existed in 1960 and 1961. On this projection, the business damages from lost earnings were calculated immediately prior to suit for a period of four years, as required under the Statute of Limitations, from which it was calculated the value of the business capitalized at ten times earnings would be $621,108.00. An actual projection (Projection B) of 8.26%, based on the years 1960 and 1961, resulted in a calculation of damages of $823,778.00. An optimistic projection (Projection C) made on the basis of 9.-5% of a greater market share than existed in 1960 and 1961, ended in a projection of damages of $1,023,108.00.

For ease of understanding, these calculations are set forth below:

[See following page]

## COLEMAN MOTOR COMPANY
### VALUE OF THE BUSINESS AS A GOING CONCERN

| METHOD I. | PROJECTION A | PROJECTION B | PROJECTION C |
|---|---|---|---|
| Average earnings 1965–69 after taxes, but before Mr. Coleman's salary | $ 40,400 | $ 53,800 | $ 66,200 |
| Capitalized at 10 times earnings | $ 404,000 | $ 538,000 | $ 662,000 |

| METHOD II. | | | |
|---|---|---|---|
| Average earnings 1967–69 after taxes, but before Mr. Coleman's salary | $ 41,000 | $ 54,300 | $ 67,000 |
| Capitalized at 10 times earnings | $ 410,000 | $ 543,000 | $ 670,000 |

| METHOD III. | | | |
|---|---|---|---|
| 1969 earnings | $ 47,000 | $ 61,000 | $ 74,000 |
| Capitalized at 10 times earnings | $ 470,000 | $ 610,000 | $ 740,000 |
| Average value under the three methods | $ 428,000 | $ 563,670 | $ 690,670 |

### COLEMAN MOTOR COMPANY
### DAMAGES

#### I.  BUSINESS DAMAGES FROM LOST EARNINGS

| | PROJECTION A | PROJECTION B | PROJECTION C |
|---|---|---|---|
| Net earnings | $ 283,000 | $ 421,000 | $ 552,000 |
| Income taxes | $ 81,000 | $ 152,000 | $ 221,000 |
| Net earnings after taxes, but before salary deduction | $ 202,000 | $ 269,000 | $ 331,000 |

#### II.  SUMMARY OF DAMAGES

| | PROJECTION A | PROJECTION B | PROJECTION C |
|---|---|---|---|
| Business damages from lost earnings | $ 202,000 | $ 269,000 | $ 331,000 |
| Value of the business (previous table) | $ 428,000 | $ 563,670 | $ 701,000 |
| Subtotal | $ 630,000 | $ 832,670 | $1,032,000 |
| *Deduct:* | | | |
| Proceeds from sale of assets | $ 8,892 | $ 8,892 | $ 8,892 |
| TOTAL DAMAGES | $ 621,108 | $ 823,778 | $1,023,108 |

The fact that the jury awarded $300,000 indicates that it reduced by more than 50% the calculated pessimistice projection, and demonstrated a clear understanding of the problems of the determination of damages in this type of proceeding.

■ The Defendants also objected to the introduction of evidence of conspiracy to violate the anti-trust laws prior to the Plaintiff's acquisition of the Dodge Franchise and subsequent to the date that the Plaintiff was put out of business. This evidence was admitted to show a continuity of a predatory intent and was in accord with established law. United States v. General Motors Corporation, 121 F.2d 376 (7th Cir. 1941); United States v. Greater Kansas City Retail Coal M. Ass'n., 85 F.Supp. 503 (W.D.Mo.1949); In re United Shoe Machinery Corporation, 7 F.R.D. 756 (D.C. Mass.1947). See Wigmore, Section 382, which states:

"The prior or the subsequent existence of such a fact is always evidential to show its existence at a time in issue, upon the general experience that such facts involve a human attitude more or less continuous and permanent."

■ A somewhat more lengthy discussion is required with respect to the *Defendants'* contention that a juror should be withdrawn and a mistrial ordered when evidence of a jury's verdict in a prior similar case is brought before the jury by the *Defendant*. In our situation, the Plaintiff called as one of its witnesses Samuel Liberto, President and Stockholder of Mt. Lebanon Motors. On cross-examination, Defendants' Counsel, to show bias and interest, asked Mr. Liberto whether or not he had been angry at Chrysler for cancelling Mt. Lebanon's franchise to sell Dodge automobiles in 1964, and whether he had brought a number of law suits against Chrysler. To the second of these questions, he answered: "Two to be exact; one for the same case as this (anti-trust), and the second one for signs that they were supposed to have bought from me that I never got paid for." Defendants' counsel, not content with this answer, then asked whether or not in the first suit he had failed to receive any money, to which he answered in the affirmative. Plaintiff's counsel then asked Mr. Liberto in rebuttal if the jury had not found that Chrysler had violated the anti-trust laws. At this point the Court instructed Plaintiff's counsel that he was to proceed no further, but that the Court would permit only the jury's special findings in the Mt. Lebanon case to be admitted. The jury was instructed that these findings were admitted "solely for the purpose of determining what weight, if any, or the fair weight that you will give to the testimony as given by Mr. Liberto or whether or not in any way the testimony was affected by any biased interest or prejudice in this case." The Defendants then renewed their Motion for the Withdrawal of a Juror and the Court denied the Motion.

The Defendants' counsel opened the door by his questions on cross-examination and it must be recalled that only after the door was opened did counsel for the Plaintiff then, by way of permissible rebuttal, show the true nature of the jury's verdict in the Mt. Lebanon case. In the light of the situation as it developed, this Court took every possible precaution against the admission of any impermissible testimony and feels that the matter was fully covered and correctly handled, not only in the admission of testimony, but also in its special charge to the jury.

Counsel for the Plaintiff did go further and next called for cross-examination the Defendant's employee, K. L. Heatherly, a former Dodge Regional Manager in Pittsburgh. After inquiring about his duties, Plaintiff's counsel asked Mr. Heatherly if he was aware of the jury's findings in the Mt. Lebanon case and that Chrysler was violating the anti-trust laws. Defendants objected to the question but the objection was overruled, and counsel for the Defendants did not at that point make a Motion for

the Withdrawal of a Juror. The Court, in two pages of instructions to the jury, clearly limited the witness' testimony to the question of whether or not Chrysler "carried on any acts after any kind of notice to them with respect to the whole problem here involved" (of possible anti-trust implications). In this, there was no error.

Defendants also contend that the Court erred in permitting Plaintiff's witness, Clarence Coleman, to testify concerning the effect of a letter received from the Defendants notifying him that he could not designate any successor to take his place at a specific location. The testimony was elicited not for the purpose of indicating the legal effect of the notification, but solely for the purpose of showing the communications from Chrysler to Dodge Dealers and what influence, if any, they had on the stability and future operations of Coleman Motor Company. It was clearly admissible.

We have carefully reviewed all of the forty-four errors claimed by the Defendants and find none of them to be of any substantial merit. The Defendants requested certain points for charge based upon factual assertions which were isolated from the testimony and which, if given, would have proven unfair. It might be lawful for Chrysler to furnish D.E. and Contractual Dealers with so-called "launching" advertising assistance; that a manufacturer-supplier may lawfully compete at a retail level with its own dealers; or a manufacturer or supplier may compete so successfully as to drive Private Capital Dealers out of business; or that the non-designation letters did not breach the franchise agreement with dealers; or that a manufacturer or supplier could lawfully replenish the capital of a wholly owned dealership. Nevertheless, viewed as a whole and in light of the Defendants' original dealership agreements, the question for the jury was fairly presented: Whether or not the Defendants' conduct amounted to an attempt to monopolize the distribution of its products to the

exclusion of its Private Capital Dealers, and if so, was Chrysler thus guilty of a violation of the anti-trust laws of the United States? As long as that system of distribution existed, no one could wrongfully monopolize that trade, or attempt to monopolize, for an illegal purpose. United States v. Klearflax Linen Looms, 63 F.Supp. 32, 39 (D.Minn. 1945).

Accordingly, for the reasons as hereinabove set forth, the Defendants' Motion for Judgment Notwithstanding the Verdict and Alternatively for a New Trial, is refused.

An appropriate Order will be entered.